UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DOUGLAS WEISSERT,

                     Petitioner,                  Case No. 1:10-cv-851

v.                                      Honorable Robert Holmes Bell

CARMEN PALMER,

                     Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Following a jury trial in the Muskegon County Circuit Court, Petitioner was convicted of first-degree felony murder, MICH. COMP. LAWS § 750.315c, conspiracy to commit armed robbery, MICH. COMP. LAWS § 750.529, assault with intent to rob while armed, MICH. COMP. LAWS § 750.89, first-degree home invasion, MICH. COMP. LAWS § 750.110a(2), and three counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.  On November 19, 2007, Petitioner was resentenced to life imprisonment for the felony-murder conviction, 17 to 35 years' imprisonment for the conspiracy-to-commit-armed-robbery and assault-with-intent-to-rob convictions, 7 to 20 years on the home-invasion conviction, and three consecutive two-year prison terms on the felony-firearm convictions.  On November 20, 2008, the Michigan Court of Appeals affirmed, but it remanded the case for correction of the judgment of sentence to reflect that the predicate offenses had been vacated. The Michigan Supreme Court subsequently denied his

application for leave to appeal on September 11, 2009.  The instant habeas petition was filed within

the one-year limitations period.

In his *pro se* petition, Petitioner raises nine grounds for relief, as follows:

I.     DEFENDANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT OF CONFRONTATION BY THE ADMISSION OF THE PRELIMINARY EXAM TESTIMONY OF EDDIE LEWIS AND CONSEQUENTLY WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL AND HIS RIGHTS UNDER CONST 1963, ART 1, § 17, 20. ADDITIONALLY, THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING THIS TESTIMONY UNDER MRE 804(B)(1).

II.    THE ADMISSION OF EDDIE LEWIS' STATEMENTS TO HIS WIFE, ANGIE LEWIS, VIOLATED DEFENDANT'S RIGHTS UNDER THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT AND CONST 1963, ART 1, § 17, 20.   ADDITIONALLY, THE [] TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING THIS EVIDENCE UNDER MRE 804(b)(3).  DEFENDANT WAS THUS DENIED A FAIR TRIAL.

III.   THE TRIAL COURT ERRED IN ADMITTING THE STATEMENTS GIVEN BY DEFENDANT TO THE POLICE.  THE ADMISSION OF THE STATEMENTS ALSO VIOLATED THE FIFTH AMENDMENT BECAUSE THE DETECTIVE FAILED TO STOP THE INTERROGATION WHEN DEFENDANT ASKED FOR AN ATTORNEY.

IV.    THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A DIRECTED VERDICT BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN A VERDICT OF GUILTY ON AN AIDING AND ABETTING THEORY.   ACCORDINGLY, DEFENDANT['] S RIGHTS TO DUE PROCESS WERE VIOLATED BY HIS CONVICTION WHEN THERE IS INSUFFICIENT EVIDENCE TO SUPPORT AIDING AND ABETTING LIABILITY.

V.     DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO A PROPERLY INSTRUCTED JURY WHEN THE TRIAL COURT GAVE AN ERRONEOUS NON-STANDARD JURY INSTRUCTION ON "MALICE," CONTRARY TO US CONST AMS VI, XIV; CONST 1963, ART 1, § 17, 20.

VI.    DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO MAKE THE

CONTEMPORANEOUS OBJECTIONS THAT (1) ADMISSION OF EDDIE LEWIS' PRELIMINARY EXAMINATION TESTIMONY VIOLATED THE RIGHT OF CONFRONTATION AND (2) ADMISSION OF EDDIE LEWIS['] STATEMENTS TO HIS WIFE ANGIE VIOLATED DEFENDANT[']S SIXTH AMENDMENT RIGHT OF CONFRONTATION.

VII.    THE TRIAL COURT ABUSED ITS DISCRETION IN NOT ORDERING AN EVIDENTIARY HEARING AS TO WHAT OCCURRED IN THE CHAMBERS OF THE DISTRICT JUDGE DURING THE PRELIMINARY EXAMINATION.

VIII.   DEFENDANT[']S SENTENCE WAS IMPROPERLY ENHANCED ON THE BASIS OF FACTUAL FINDINGS NOT FOUND BY THE JURY BEYOND A REASONABLE DOUBT CONTRARY TO HIS SIXTH AMENDMENT RIGHT TO A JURY TRIAL AND HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS.

IX.     TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING 404(B) "OTHER BAD ACTS" EVIDENCE.

(Pet'r's Br. in Supp. of Pet., docket #2, Page ID##5-7.)  Respondent has filed an answer to the petition (docket #13) stating that the grounds should be denied because they are procedurally defaulted, noncognizable, or without merit.  Upon review and applying the AEDPA standards, I find that Petitioner's claims are either noncognizable or without merit.  Accordingly, I recommend that the petition be denied.

**Procedural History**

**A.      Trial Court Proceedings**

The state prosecution arose from a conspiracy to rob and attempted armed robbery of Frank Sibson, which resulted in the shooting death of Sibson.  Petitioner was charged with open murder, conspiracy to commit armed robbery, assault with intent to commit armed robbery, first-degree home invasion, and three counts of possessing a firearm during the commission of a felony. Following a preliminary examination on April 28, 2006, he was bound over on all charges.

- 3 -

Prior to trial, the court held numerous hearings on the many motions filed by the prosecution and the defense. Over the course of two hearing dates, the court considered the prosecution's motion to settle the issue of whether up to ten witnesses should be warned of their Fifth Amendment rights prior to giving testimony. (*See* 10/10/06 Tr. of Hr'g on Mot. to Settle, docket #18; 10/23/06 Tr. of Hr'g on Mot. to Settle, docket #19.) At the end of the second hearing, the court ruled that it would administer the warnings outside the presence of the jury, in accordance with *People v. Giacalone*, 250 N.W.2d 492, 495 (Mich. 1977), *People v. Avant*, 597 N.W.2d 864, 873-74 (Mich. App. 1999), and *People v. Calington*, 333 N.W.2d 260, 263 (Mich. App. 1983). (10/23/06 Tr. of Hr'g on Mot. to Settle, docket #19 at 5-8.)

The court heard arguments on three additional motions: the prosecutor's motion to clarify the admissibility of Petitioner's statements to the police and Petitioner's motion to suppress the statements; the prosecutor's motion in limine regarding evidence of Anjanette Lewis' mental health history; and the prosecutor's motion in limine regarding Ms. Lewis' bias due to a Silent Observer reward. (11/9/06 Tr. of Hr'g on Mots. in Limine, docket #21.) After extensive argument, the court held that Petitioner's invocations of his right to counsel were not unequivocal and therefore did not render subsequent statements inadmissible. (*Id.* at 58-60.) The court, however, ordered further briefing on whether Petitioner had properly waived his *Miranda* rights in the first instance, given that the police had not asked if he understood his rights and voluntarily waived them. (*Id.* at 56, 61-62.) The court held that, based on a prior transcript, Petitioner could challenge Ms. Lewis' bias on the basis of the reward only to the extent that she believed at the time of Mr. Lewis' trial that she owed the prosecutor a favor for their assistance in her getting the reward; Petitioner was not allowed to suggest that she went to the police because of the reward, because the evidence indicated

- 4 -

that she was not aware of the reward until after she went to the police.  (*Id.* at 78.)  The court also granted the prosecutor's motion to exclude questioning about Ms. Lewis' mental health, though it indicated that it would revisit the issue, if Petitioner established the factual basis for such an inquiry. (*Id.* at 91-93.)  The court did not hear arguments on the prosecutor's motion to use a non-standard jury instruction, based on the parties' understanding that the court would decide the motion at the time jury instructions were settled.  (*Id.* at 3.)  Nevertheless, the court issued an order the following day, granting the prosecutor's motion.  (Reg. of Action, docket #15 at 6, #62.)  Petitioner filed an application for leave to file an interlocutory appeal of the order.  The court granted immediate consideration, but denied interlocutory review on November 20, 2006.  (11/20/06 Mich. Ct. App. Ord., docket #43.)

On November 15, 2006, the trial court heard oral argument on Petitioner's motion to adjourn trial, in light of the pending appeal, the pending DNA testing results, a police delay in the delivery of video-recorded witness statements to Petitioner, and Petitioner's pending motion concerning the prosecution's late notice of its intent to use other bad acts evidence under MICH. R. EVID. 404(b), which was set for hearing the following Monday.  (11/15/06 Tr. of Hr's on Mot. to Adjourn, docket #22.)  The court offered a trial date of January 17, 2007, but that date conflicted with the prosecutor's involvement in another case.  Because there existed no reasonable likelihood that the case could be rescheduled for many months, the court denied the motion to adjourn.  (*Id.* at 24-27.)

The following day, November 16, 2006, the prosecutor produced nine witnesses who had possible Fifth Amendment exposure, for inquiry by the court about their intent to waive their rights and testify at trial.  (11/16/06 Tr. of Hr'g, docket #23.)  At a hearing held on November 21,

- 5 -

2006, following inquiry by the court, Petitioner's wife, Jami Weissert, invoked her Fifth Amendment right and indicated that she would not testify at trial.  (11/21/06 Tr. of Hr'g on Various Matters, docket #25 at 8-11.)  She also testified that, if immunized by the prosecution, she would invoke her marital privilege not to testify against her husband.  (*Id.* at 15.)  One additional witness was examined on the issue.  (*Id.* at 19-24.)

At the same hearing, the court considered Petitioner's motion to preclude the use of 404(b) evidence and Petitioner's motion to reconsider the motion to adjourn.  Following extensive arguments, the court denied Petitioner's motion to exclude other-acts evidence and denied reconsideration of the order denying adjournment.  (*Id.* at 65-69.)  The court also ruled on the issue for which it had requested supplemental briefing: whether Petitioner's statements should be excluded because the police did not ensure that he understood his rights and did not obtain a clear waiver of rights.  The court ruled that the statements were admissible.  (*Id.* at 71.)

Trial began on November 18, 2006 and ended on December 20, 2006.[1]  Before jury selection, the court questioned a previously convicted co-defendant, Eddie Lewis, who, on the advice of appellate counsel, invoked his Fifth Amendment right not to incriminate himself and refused to testify.  (Tr. I at 7-8.)  After the jury had been selected and excused from the courtroom,

---

[1]Trial transcripts hereafter will be referred to as follows:
Volume 1 (Nov. 28, 2006):  "Tr. I at ___";
Volume 2 (Nov. 29, 2006):  "Tr. II at ___";
Volume 3 (Nov. 30, 2006):  "Tr. III at ___";
Volume 4 (Dec. 1, 2006):  "Tr. IV at ___";
Volume 5 (Dec. 5, 2006):  "Tr. V at ___";
Volume 6 (Dec. 6, 2006):  "Tr. VI at ___";
Volume 7 (Dec. 7, 2006):  "Tr. VII at ___";
Volume 8 (Dec. 12, 2006):  "Tr. VIII at ___";
Volume 9 (Dec. 13, 2006):  "Tr. IX at ___";
Volume 10 (Dec. 14, 2006):  "Tr. X at ___";
Volume 11 (Dec. 15, 2006):  "Tr. XI at ___";
Volume 12 (Dec. 19, 2006):  "Tr. XII at ___";
Volume 13 (Dec. 20, 2006):  "Tr. XIII at ___."

the court considered the prosecutor's motion to introduce the testimony given by Mr. Lewis at Petitioner's preliminary examination.  (Tr. II at 204-11.)  The court issued an oral opinion, holding that Lewis' preliminary-examination testimony was admissible.  (*Id.* at 212-14.)

The prosecutor introduced a recording of the 911 call made by the victim's wife on February 1, 2006 at 4:14 a.m. to the Muskegon Central Dispatch for 911.  (Tr. III at 35.)  Patrolman Michael Weaver of the Muskegon Township Police Department was called to back up Officer Sliter at 1521 Mill Iron Road, and he was told to come to the back of the house.  (*Id.* at 36-37.)  He parked in the driveway behind Officer Sliter and entered the back of the house through the slider door on the deck.  Weaver saw Frank Sibson lying on the floor in the kitchen, close to the breezeway, face up, with his head pointing toward Weaver and his feet pointing toward the breezeway and back bedroom.  (*Id.* at 37, 42-43.)  Sibson did not appear to be breathing.  (*Id.* at 43.)  The body looked like it had been moved, and he understood that Mrs. Sibson had rolled him over and attempted CPR. (*Id.* at 42.)  When Weaver arrived, Officer Sliter was talking to Mrs. Sibson in the other corner of the kitchen.  (*Id.* at 37.)  Weaver conducted a quick search to see if anyone else was in the house, but he found no one, except the children.  (*Id.* at 38.)  As he passed through the breezeway into a large bedroom that had previously been a garage, Weaver saw what appeared to be a gun in the middle of the floor, but a closer look showed it to be a Daisy CO2 BB gun.  He photographed the gun, but left it in place.  (*Id.* at 39.)  Weaver also took pictures of the exterior of the home and the pole barn at the back of the property.  (*Id.* at 45.)  A canine unit was called, and Weaver was outside when the dog picked up a trail near the pole barn, which led to the neighbor's house.  (*Id.* at 48.) Weaver also was involved in seeking a search warrant of the home, the pole building, and the vehicles on the property.  (*Id.* at 49.)

Muskegon Township Police Officer Tom Bartolemeolli testified that he arrived at the Mill Iron Road address at about 6:00 a.m. on February 1, 2006, by which time the Michigan State Police Forensic Crime Division had arrived. (*Id.* at 53-54.) Police evidence tape was wrapped around the entire property to keep people out. (*Id.* at 55.) Sometime later, after it was light outside, the search warrant arrived. (*Id.* at 55.) Bartolameolli executed the warrant. (*Id.* at 53.) Bartolameolli identified pictures of the property, the garage (or pole barn), the home, and a small shed. (*Id.* at 55-58 .) Photos of the back deck of the house showed two slider doors, one going into the master bedroom and one going into the kitchen. (*Id.* at 58.) Bartolameolli also identified photographs of a metal container that once held dog food, pieces of dog food on the kitchen and breezeway floor, and the container lid. (*Id.* at 59-60.) Other photographs showed blood on the breezeway and kitchen floors, an airsoft BB pistol on the breezeway floor, pieces of the airsoft pistol, and BBs. (*Id.* at 61-62.) In addition, Bartolameolli identified photographs of the outside and inside of a blue duffel bag found in the master bedroom, which contained cash totaling $71,050.00. (*Id.* at 64-66.) Bartolameolli found an orange piece of paper and two white sheets of notebook paper on the top of the dresser in the master bedroom, which listed a number of names who owed and paid various amounts of money, showing a total of $65,500.00 that was owed. (*Id.* at 68-70.) The names in the various entries included Troy, Conan, Mike, Pete, Decker, Ski, Jerry, Doug, Rop, Adam, Dave, Phil, Chuck, Matt, Dale, Sween, Big Dave, Rod, Mark, Wassine, Walter, and Malotke. (*Id.* at 69-72.) During the search of the pole barn, police seized a .44 magnum pistol with a scope, a .22 caliber Ruger rifle (which was approximately the caliber used in the homicide), two clips with .22 rounds in it and some ammunition. (*Id.* at 74-76.) In addition, officers found a display rack of other rifles and shotguns, which they did not seize because they did not believe they were related to the

- 8 -

incident.  (*Id.* at 77-77.)  He acknowledged that the search warrant authorized the seizure of all weapons and that he should have seized the remaining weapons.  (*Id.* at 77.)  Bartolameolli identified both pictures of and the actual exhibits containing the quantities of marijuana and hallucinogenic mushrooms discovered in the drawers of the desk and the filing cabinet found in the pole barn.  (*Id.* at 77-90.)  Additional hallucinogenic mushrooms were found in the kitchen.  (*Id.* at 99.)  Bartolameolli also identified multiple packages of rolling papers, two sets of hemostats with marijuana ends in them, multiple boxes of Ziploc bags and paper bags, all found in a blue cooler in the barn.  (*Id.* at 91-94.)  Bartolameolli testified that he found a bag of powdery, white substance that was later identified as methamphetamine, hidden near the door.  (*Id.* at 98.)  He did not seize the trash can dog food holder, because he assumed that the crime lab group would have taken it if it was relevant.  (*Id.* at 103.)

Muskegon Township Police Officer Tim Thielbar attended the autopsy of Frank Sibson, which was conducted by Dr. Markey.  (*Id.* at 125.)  A total of three bullets were taken from Sibson's body, and Thielbar took possession of the bullets, marked them, and turned them over to Detective Sanford for mailing to the crime lab.  (*Id.* at 126-28.)

Before Brenda Malotke (B. Malotke) testified, the court instructed the jury that her evidence ws the type of other-acts evidence under Rule 404(b), about which the court had instructed the jury during voir dire.  The court reiterated that the evidence should only be used as evidence of a scheme or plan, lack of an accident, or to prove Petitioner's intent in the crimes charged, not that Petitioner committed other crimes.  (*Id.* at 135-37.)  B. Malotke testified that she was Petitioner's cousin and friend and the friend of Petitioner's wife.  (*Id.* at 138.)  B. Malotke was at Petitioner's house a few days after Frank Sibson's death.  At that time, Petitioner told B. Malotke that he was

done selling marijuana.  (*Id.* at 139.)  On cross-examination, B. Malotke acknowledged that, instead of saying that he wasn't going to sell drugs anymore, Petitioner might have said that he wasn't going to "mess with" drugs anymore, as she told Detective Sanford earlier.  (*Id.* at 141-42.)

Tim Malotke (T. Malotke), Brenda's husband, testified that he, Petitioner and Frank Sibson annually took a weekend motorcycle trip together.  (*Id.* at 150-52.)  According to T. Malotke, Petitioner and Sibson were close friends.  (*Id.* at 152.)  T. Malotke testified that he did not see Petitioner at Frank Sibson's funeral.  (*Id.* at 154.)  He acknowledged, however, that he did not see Petitioner at Sibson's wedding, and he did not see Sibson at Petitioner's 40th birthday party.  (*Id.* at 156-57.)  He also acknowledged the he did not recall having seen Petitioner at Sibson's house. (*Id.* at 157-58.)  T. Malotke had seen Eddie Lewis at Petitioner's house before and, on one occasion, Malotke, Sibson and Petitioner and their spouses were at Lewis' house for drinks, after the bar closed.  (*Id.* at 159.)

Andrew Whitlock testified as the custodian of records at Cannon Muskegon about Petitioner's work records.  (*Id.* at 165.)  Petitioner left work four hours early on February 1, 2006, he exchanged his February 2, 2006, shift with another worker, he left four hours early on February 3, 2006, and he called in sick on February 10, 2006.  (*Id.* at 166.)  Other documents reflected that Petitioner had made a shift change from February 2 through February 10, because of his son's surgery. (*Id.* at 167-68.)  Petitioner filled out the request for shift change on January 31, 2006.  (*Id.* at 171.)

Muskegon Police Detective Julie Sanderson testified that, on April 28, 2004, Petitioner reported property damage to his vehicle caused by a rock falling off a truck.  (*Id.* at 178.) Petitioner reported that Eddie Lewis was a passenger in the vehicle. (*Id.* at 179.)

Danielle Sibson, the wife of the deceased, testified that, on February 1, 2006, she lived at 1521 South Mill Iron Road with her husband Frank and her two children, ages three and six. (*Id.* at 181.) On the night of the incident, the family had eaten out, and they returned home at about 8:00 p.m. She immediately put her children to bed. (*Id.* at 182.) Frank Sibson was a sheet-metal worker, but he had been laid off from work on January 10, 2006. (*Id.* at 182-83.) Frank was the primary user of the building behind the house, and it was where he had his metal-working equipment. (*Id.* at 183.) Danielle testified that she was unaware of any family financial difficulties, and the family went out to dinner and went down to Chicago frequently for day trips. She remembered staying overnight twice in the prior six months. (*Id.* at 184-85.) She testified that, on family trips to Chicago, they never brought back any drugs. Danielle acknowledged, however, that Frank went to Chicago by himself on other occasions. (*Id.* at 185.) Although Frank Sibson usually stayed up later than Danielle, on the night of the incident, she went to bed shortly after 11:00 p.m., and Frank was already asleep. She did not lock up the house, as Frank typically handled locking up. (*Id.* at 185-86.) Danielle fell asleep, but she was awakened by two men standing over her bed with guns pointed at Danielle and Frank. The prosecutor labeled the men "A" and "B." The men were yelling," [W]here's the money". (*Id.* at 187.) Both men were at first on her side of the bed, which was closest to the breezeway leading to the kitchen. (*Id.* at 191.) Both men were wearing masks and gloves. (*Id.* at 192.) When she saw the men, she reached over and slapped Frank to wake him up, because he was a heaving sleeper. (*Id.*) Frank screamed, "[N]o, no no" a few times, "jumped out of the bed, did a few turns around the – around the end of the bed and attacked B." (*Id.* at 192-93.) B was considerably taller than A. (*Id.* at 193.) Only dim light from the lights outside the garage penetrated the room through the french doors. (*Id.* at 194.) When Frank attacked B, Danielle

- 11 -

felt a rush of air, and then she jumped on A.  (*Id.* at 195.)  She did not remember what happened with A, because she blacked out for awhile.  (*Id.*)  She was struck in the face by a shot from the BB gun fired by A.  (Tr. V at 36.)  Danielle testified that she did not hear the men say anything after demanding to know where the money was until she was in the laundry area or mud room off the breezeway.  (Tr. III at 196-97.)  She was on her stomach, and A was holding her down, halfway in the mud room.  At that point, she heard a "pop," which she knew was a gunshot, and it came from her left.  (*Id.* at 198-99.)  Danielle testified that she heard a total of two shots, close together.  (*Id.* at 207.)  She lifted her head toward the sound, and she saw Frank and B wrestling and fighting in the breezeway.  (*Id.* at 198-99.)  A also looked over at Frank and B, lifting off of Danielle. (*Id.* at 202.)  The light in the breezeway was better than in the bedroom.  (*Id.* at 199-200.)  Danielle blacked out again for a bit.  (*Id.* at 203.)  Danielle described a small metal trash can that they kept in the mud room, which they used to store a small amount of dog food, for when the dog was in the house rather than in the kennel. She heard the can hit someone and heard the food scatter on the kitchen floor. (*Id.* at 203-04.)  Danielle realized that A had gotten off of her and that Frank was in the kitchen, in front of the stove.  She jumped up and threw herself on top of Frank, yelling at the men to leave, but B kept screaming at her, "[W]here [is] the money, where [is] the money."  (*Id.* at 202, 204, 206.) She had no idea what they were talking about, because Frank had been laid off.   She yelled that there was no money.  (*Id.* at 204, 206.)  The men looked at her, shook their heads in confusion, and walked out the sliding glass door.  (*Id.* at 206.)  Danielle waited for a few seconds until they were gone, and then she locked all the doors and checked on her children.  She came back to Frank and asked if she needed to call an ambulance, and he said, "[Y]es."  She did not know that he had been shot, and she did not see any blood at that time.  (*Id.* at 207.)  The 911 operator asked her to see if

Frank had been shot, so she turned his body over and saw a gunshot wound in his abdomen, on his

side.  (*Id.* at 208.)  She also saw a wound on his leg, which looked like a cut.  She saw that Frank

was turning blue, and, following instructions from the 911 operator, she tried to do CPR, but she did

not know how to do it right.  (*Id.*)  When the police got there, the 911 operator told her to answer

the door.  Danielle first went to the front door and unlocked it, before realizing the officer was at the

sliding door.  After letting him in, she noticed that one of the guns was on the floor in the laundry

room.  At the same time, she noticed blood.  (*Id.* at 209.)  She went into the living room with a

police officer, while the ambulance people worked on her husband.  (*Id.* at 209-10.)

Danielle Sibson testified that she never saw the blue duffel bag before she came to

court, and she had not seen the bag in her bedroom.  She knew that Frank was supposed to leave for

Chicago in the morning to play indoor golf for a day with his friend "Tim."  (*Id.* at 210-11.)

Danielle identified Petitioner, and she testified that Petitioner and her husband had shared a room

on their motorcycle trips up north.  (*Id.* at 212.)  She occasionally saw Petitioner at her home, their

children played sports together, and their families got together at a pig roast on a motorcycle bike

run for cancer.  (*Id.* at 212-14.)  She never saw Danwood Durst at her residence, and she did not

know him.  She had met Eddie Lewis before the incident, but she did not remember that when the

police first asked her.  (*Id.* at 215.)   Rob Lucas jogged her memory, and she realized that two or

three years before the incident, she and Frank went over to Lewis' house after the bar, because

Lewis was cooking chicken.  Petitioner and his wife and Tim and Brenda Malotke also were part

of the group.  (*Id.* at 216.)  She did not see Lewis at any other time.  (*Id.* at 218.)  She did not see

Petitioner at either of the visitation periods or the funeral for Frank Sibson, and Petitioner did not

sign the visitor book.  (*Id.* at 218.)  He also did not send flowers, and he never called Danielle after

- 13 -

Frank's death.  (*Id.* at 218-19.)  The last time she saw Frank, he was breathing, and she thought from the sounds she heard from the kitchen that he was breathing when they took him from the house. (*Id.* at 221.)

Danielle Sibson denied letting the intruders into her house and denied meeting with them before the incident to plan the robbery.  (*Id.* at 219.)  She acknowledged she that knew about the drugs in the garage, and she admitted lying to the police when they first asked her about her knowledge of the drugs.  (*Id.*)  She was afraid, and she hoped that the drugs would not come out in the investigation.  (*Id.* at 222.)  Danielle was interviewed by the police numerous times during her 14-hour stay at the police station on February 1, 2006.  The police were rude during their interrogations of her, and they told her that they did not believe her story.  (*Id.* at 220, 228.)  She was interviewed again on February 4 and March 1, 2006.  (*Id.* at 227.)  She hired a lawyer, because the police told her that they were certain that she committed the crime, and she originally was the lead suspect  in the case.  (*Id.* at 223, 227.)  Danielle filed a claim to get back the $70,000.00 seized by the police.  She knew that her husband had been a big gambler and she thought the money might be gambling winnings.  Frank Sibson never told Danielle anything about money, and she did not realize at the time how many drugs Frank was selling.  (*Id.* at 222.)  She later dropped her claim.  (*Id.* at 227.)  Danielle testified that she did not know that there were drug records in her bedroom. However, once shown the records, she recognized most of the names.  (*Id.* at 223.)  "Adam" was Adam Hodges.  "Troy" was someone whose name she had heard before and who she knew had gone to the garage with Frank.  "Chuck" was a man who had attended sheet-metal school with Frank and who had been part of their lives for four years.  "Dave" was Dave Phillips.  She knew that "Doug" was Petitioner, because Doug Weissert was the only "Doug" Frank knew.  (*Id.* at 224.)  She did not

know who "John" was, because Frank knew several "Johns."  "Decker" was Bob Decker, one of Frank's best friends.  "Conan" was Frank's cousin, and "Dale" was a man who had lived down the road from Danielle's first husband.  (*Id.* at 225.)

On cross-examination, Danielle denied being involved in the drug trade with her husband.  She admitted buying a gun cabinet as a gift for Frank, but she testified that Frank was not allowed to have guns in the home, only in the garage.  (*Id.* at 231-32.)  Danielle also did not want marijuana in the house.  (*Id.* at 236.)  She denied having counted out the money with Frank and denied being given large sums of money by Frank.  (*Id.* at 232.)  Frank Sibson spent the majority of the time he was at home in the garage, tinkering and visiting with friends, most of whom went directly to the garage when they visited.  (*Id.* at 237-38.)  He had a phone in the barn, and he also had a cell phone.  (*Id.* at 238.)  She knew that her baggies frequently went missing, but she never thought Frank had taken them, and she thought he was only sold a small amount of marijuana to his friends.  (*Id.* at 239, 235-36.)  She also denied knowing that Frank's friend "Tim" in Chicago was Frank's drug supplier, who sold Frank 60 to 100 pounds of marijuana every three or four months. (*Id.* at 240.)  She could not say how often Frank went to Chicago by himself.  (*Id.* at 243-44.)  She acknowledged that when they went to Chicago as a family, they had gone to Tim's home a couple of times, but she denied seeing Frank bring anything to Tim's house.  (*Id.* at 242.)

On the fourth day of trial, before the jury was brought into the courtroom, the parties addressed a number of issues concerning the continuing disclosure of a variety of evidence.  (Tr. V at 4-16.)  In addition, Mike Malotke invoked his Fifth Amendment rights and declined to testify at trial.  (*Id.* at 20-21.)

- 15 -

Cross-examination of Danielle Sibson continued.  (*Id.* at 23.)  Danielle acknowledged that, when the police asked for a list of Frank's close friends, she did not name Petitioner as a close friend.  (*Id.* at 28.)  She acknowledged that the period was a difficult time in their marriage, and she had told Sibson that she was not dealing with him and drugs again, after having experienced him going through rehabilitation.  (*Id.* at 31, 33.)  In addition, she admitted that she had found a bag of mushrooms in the house only a day or two before his death.  (*Id.* at 33.)  Danielle Sibson acknowledged that, during her three-year marriage, she had a sexual relationship with another man, Charles Thigpen.  (*Id.* at 67.)

Sergeant Dean Lohman testified that he was part of the homicide task force put together to solve the homicide on Mill Iron Road.  (*Id.* at 78.)  Danwood Durst consented to the search of 1731 Russell Road in Muskegon County.  (*Id.* at 80.)  Because snow had fallen, the police initially could not find the pair of gloves and orange knit ski mask that he had told them he had buried.  (*Id.* at 81-82.)  They brought Durst to the property that same day, and Durst pointed out where the hat and gloves were buried.  After substantial digging, they found the hat and both gloves.  (*Id.* at 82.)  Lohman identified the gloves and hat for the jury.  (*Id.* at 83-84.)

The prosecution then played the silent videotape made of the crime scene at the Sibson residence.  (*Id.* at 84-85.)

Muskegon County Sheriff's Deputy Kendall Jeppesen testified that, on February 28, 2006, at 1:50 a.m., she responded to a domestic-disturbance call from Antoinette [sic] Lewis at 2165 North Buys in Laketon Township.  Lewis told Jeppeson that her husband, Eddie Lewis, was the one who killed the man on Mill Iron Road.  (*Id.* at 98-99.)  Undersheriff Roesler also responded to the

- 16 -

house.  Based on Antoinette Lewis' evidence, Jeppeson and Roesler arrested Eddie Lewis.  (*Id.* at 99.)

Michigan State Policy Trooper Philip Marshall testified that he processed two vehicles for fingerprints:  a white Grand Prix and a red pick-up truck.  (*Id.* at 100-01.)  The Grand Prix belonged to Eddie Lewis, and the truck belonged to Petitioner.  (*Id.* at 108-09.)  Marshall lifted a total of five fingerprints from a 2-liter Pepsi bottle and the driver's window of the Grand Prix.  (*Id.* at 102-03, 109.)  He found no latent prints in Petitioner's truck.  (*Id.* at 109.)  Marshall also participated in a second search of the Sibson residence.  He searched the pole barn.  In addition to a computer, he found two baggies of marijuana, one from behind the filing cabinet near the desk, and the other from a gray tool drawer near the desk.  (*Id.* at 106-08.)

As custodian of the record of Petitioner's preliminary examination, Kristine Fauble introduced the audio recording of the testimony of Eddie Lewis.  (*Id.* at 115-118.)  The transcript of the examination also was introduced.  (*Id.* at 116.)  At the preliminary examination, Lewis acknowledged that he was charged with open murder, first-degree murder, and felony firearm.  He testified that he had not received a plea deal and that he had not been offered anything in exchange for his testimony.  (Prelim. Exam. Tr. at 60, docket #61-1, Page ID#480.)  Lewis testified that he believed he faced a sentence of life without parole, but he was testifying because he was afraid that Petitioner would kill his children.  (*Id.* at 527-28.)  Petitioner had threatened Lewis' children.  (*Id.* at 526.)  Lewis provided two lengthy, recorded statements to the police, which he believed were truthful, except that he did not identify his co-conspirators.  He also stated that, before his first interrogation, he had taken five oxycontin and between seven and twelve Valium, in an attempt to kill himself, so he did not remember everything he said at that interview.  (*Id.* at 532, 537-38, 540.)

Lewis testified that he had known Petitioner for 15 or 20 years.  (*Id.* at 489.)
According to Lewis, the robbery of Sibson's house was Petitioner's idea.  (*Id.* at 485, 490.)  Two
nights before the shooting, Petitioner drove with Lewis in Petitioner's red Ford Ranger to Durst's
house at about 12:00 or 12:30 a.m.  (*Id.* at 499-500, 503.)  When they arrived, Durst was with his
girlfriend.  They sat in the kitchen for awhile, but, in order to avoid being overheard, they went to
the basement to talk about the robbery of Frank Sibson.  (*Id.* at 500.)  Petitioner originally wanted
Durst to drive, drop Lewis off, wait while Lewis got the money, and drive away when he came back.
 Durst was supposed to be paid $500.00.  (*Id.* at 501.)  Durst wanted to participate.  (*Id.* at 502.)
They stayed together until late, and then they went in Petitioner's truck to the home of a woman
Durst knew to give her some pills.  (*Id.*)  After an hour or hour-and-a-half, they dropped Durst off,
went back to Petitioner's, and Lewis drove home.  (*Id.* at 503.)

The night before the attempted robbery, Lewis went to Petitioner's house at about
9:30 or 10:00 p.m., and he was visiting with Petitioner's family when Petitioner got home.  (*Id.* at
489.)  Petitioner waited until his wife went to bed to discuss the plan, because he did not want her
to know about it, since she was friends with Danielle Sibson.  (*Id.* at 489.)  Petitioner talked about
the robbery, and he told Lewis that he wanted "Danny" involved.  (*Id.* at 486.)  Petitioner then pulled
Lewis into the vestibule of the house and gave him a plastic bag containing a .22-caliber revolver,
which Lewis identified as People's Exhibit 4.  (*Id.* at 482-83, 490.)  Petitioner told Lewis that the
revolver was an eight-shot and that it was not to be used unless necessary for protection.  (*Id.* at 490-
91.)  They talked about going the next day.  (*Id.* at 488.)  Petitioner had a hard time locating bullets,
but he ultimately loaded the weapon.  (*Id.* at 491.)  Petitioner told Lewis that he probably would not
need the gun, but he would be carrying a lot of money, as Sibson was collecting all of his drug

money to prepare to pick up more drugs in Chicago.  (*Id.* at 491-92.)  Petitioner told Lewis that

nobody would be able to tell where the gun came from.  (*Id.* at 522.)  Lewis was under the

impression that he had gotten the gun from a friend, and he thought the friend might be Dusty,

because Lewis knew that Petitioner kept a gun at Dusty's house.  (*Id.* at 522.)

Petitioner had told Lewis on multiple occasions that he was in the drug trade with

Sibson.  (*Id.* at 492.)  Lewis did not know where Sibson lived or anything about him, and he had

only met him twice.  (*Id.* at 486, 554-55.)  Using his own red truck, Petitioner drove Lewis by the

Sibson residence.  (*Id.* at 486-87.)  Petitioner pointed out the house and counted the lights on the

road, so that Lewis would be sure of the house.  Petitioner then drove Lewis to Petitioner's own

house, and he asked Lewis if he would be more comfortable if Danny Durst went with him.

Petitioner told Lewis that the money would be in the house.  Lewis  was under the impression that

Sibson knew that they were coming and would just hand over the money.  (*Id.* at 496, 501.)

Petitioner threatened Lewis that, if he didn't pull the robbery off, Petitioner would be visiting Lewis'

kids.  (*Id.* at 496-97.)  Lewis then left the house in his own vehicle and went to pick up Durst.  They

stayed at Durst's house for awhile, and when they left, Durst was driving Lewis' car.  (*Id.* at 498.)

Durst told Lewis that he had talked to Petitioner and that he wanted to participate in

going up to get the money.  (*Id.* at 504.)  They drove by the Sibson house a couple of times.  Durst

knew of an empty factory nearby, and he pulled the car in and parked there.  They got out and

opened the trunk, where there were masks, gloves, sweatshirts, the revolver, and a BB gun that

belonged to Lewis.  (*Id.* at 505-07.)  Lewis took the revolver, and Durst took the BB gun.  They put

on the masks and gloves and went over a fence and into the woods behind the Sibson residence.  (*Id.*

- 19 -

at 507.)  They entered the Sibson house through the sliding door by the breezeway, which was partially open.  (*Id.* at 507-08.)  Lewis went in first, followed by Durst.  They turned left toward the bedroom, where the door was partially open and the lights were on.  He saw Danielle Sibson on the bed.  Lewis thought that it looked like they were expected.  (*Id.* at 508.)

When they went into the room, Frank Sibson was sleeping.  Danielle did not look shocked.  She just reached over and woke up Frank.  Lewis said, "We're here to pick up the dope man's money."  (*Id.* at 509.)  Lewis and Durst had their masks up around the top of their heads, not over their faces.  Lewis had his gun in the back of his pants with his shirt over it.  (*Id.*)  Durst, however, had the BB gun out.  Frank jumped up and launched himself at Lewis in a single motion.  (*Id.* at 510.)  Frank grabbed Lewis by his left side, and Lewis swung him around.  Durst shot Sibson with the BB gun, and Frank jumped as if stung.  Frank then jumped on Durst and began beating him.  Lewis kicked Frank off of Durst.  In the meantime, Danielle, who had been fighting Durst, left the room.  (*Id.* at 511.)  When Lewis got Frank off of Durst, Durst fell back on his elbows, and Lewis began to leave.  By this time, he had his gun out.  (*Id.* at 512.)  Frank jumped on top of Lewis, and Lewis landed on his back in the doorway between the bedroom and the breezeway.  Frank's hands were around Lewis' neck and Lewis could not breath.  (*Id.* at 513.)  He tried to get Frank off, but he started to see stars and give out, so he pulled out the gun and shot Frank in the leg twice.  (*Id.* at 513-14.)  Frank still did not stop, so Lewis aimed a bit higher and shot toward Frank's arm.  Frank struggled with Lewis over the gun, bending Lewis's hand back, and the gun went off.  (*Id.* at 514.)  Frank's grip lessened, and Lewis pushed him off and got up.  Lewis checked Frank's pulse, and he was alive.

By this time, Durst has gone, and Danielle was in the middle of the kitchen.  (*Id.* at 515-16.)  Lewis asked Danielle why they had not just given him the money, and she said that they already had paid their dope man off.  Lewis pointed to a bag and asked, "What's that over there?"  (*Id.* at 516.)  Danielle told him that there was some money, but she did not know where it was.  (*Id.* at 517.)  Lewis met up with Durst in the backyard, and they went back to the car.  Lewis then took Durst to Durst's home.  (*Id.* at 518.)  Durst was shaken up, and he told Lewis not to worry, that he would not say anything.  (*Id.* at 519.)

Lewis drove to Petitioner's house and parked in the driveway.  Petitioner came out, asked how it went, and asked for the money.  (*Id.*)  Lewis told Petitioner that there was no money and that things had gone very badly.  He told Petitioner that he had had to shoot Frank Sibson.  Petitioner asked if Lewis had killed Frank, and Lewis responded that he did not think so, he had only shot him in the leg and the shoulder.  Petitioner told Lewis that he had to get rid of the gun and everything else, and he suggested finding a place where no one would discover the items again.  (*Id.* at 520.)  Lewis went back to his own house and took a shower, because he had a lot of blood on him.  (*Id.* at 520-21.)  Frank Sibson had hit Lewis in the mouth, from which he was bleeding, he had been stabbed in his arm three or four times during the struggle, and someone had scratched his throat with their fingernails.  Lewis put his bloody clothing, the mask, and the gloves in a plastic bag and placed them in the trunk of his car.  (*Id.* at 521.)  Lewis was very upset, and he told his wife what had happened.  He and his wife then drove to his in-law's property in Denver Township, Newaygo County, near Hesperia, where he buried the gun and other items.  (*Id.* at 484, 522.)  Lewis later went to the property with the police and pointed out where he had buried them.  (*Id.* at 484.)

Over the course of about two and one-half hours, defense counsel extensively cross-examined Lewis on the status of his charges, whether he had discussed any potential agreements with the prosecutor, and about the many discrepancies between his statements to the police and his testimony at the preliminary examination. (*Id.* at 526-93.) Lewis could not remember most of his statement, but he remembered identifying the shooter as a Hispanic or mulatto man. (*Id.* at 540-41.) He also remembered telling the police that there was supposed to be over ten grand in the house, possibly as much as a hundred thousand dollars. (*Id.* at 547, 549-52.) Lewis told the police that he thought Frank Sibson was overbearing and that he did not like him, as he did not like anyone who hooked kids on drugs. (*Id.* at 557.) Lewis told police that he believed then, as he did at the time of the preliminary examination, that his shooting of Sibson was self-defense. (*Id.* at 570-71.)

Floyd Smith testified that he previously owned the German eight-shot revolver marked as People's Exhibit 208, which he was able to identify by the bent sight, the two different serial numbers on the right side of the frame and on the crane,[2] and the German insignia on the grip. (Tr. VI at 10-12.) He sold the gun to Ralph (Dusty) Meyers in the spring of 2006. (*Id.* at 12-13.) He had gotten the gun in an exchange with Dick Kolkema six or seven years before. Before he sold it to Dusty, he checked the serial numbers with the state and found that the gun was stolen. He never registered the gun with the state because he was afraid that it would be confiscated. (*Id.* at 15-16.)

City of Muskegon Detective Clay Orrison searched 4646 Stone Road in Newaygo County over the course of two days. (*Id.* at 19-20.) The ground was covered by snow, and Eddie Lewis pointed them to the area in which he had buried the weapons and clothing. (*Id.* at 21-22.) After removing some soil, the police found a camouflage wind mask, a white kitchen trash bag,

---

[2]The pivoting part of a revolver that supports the cylinder is called the crane. Wikipedia, "Revolver," https://en.wikipedia.org/wiki/Revolver.

jersey gloves, the pistol identified by Smith as People's Exhibit 208, and a second plastic bag containing a waterlogged ammunition box and some loose .22 caliber rounds.  (*Id.* at 23-25.)  The white kitchen trash bag contained a sweatshirt, a t-shirt, a pair of blue jeans, a pair of underwear, a pair of white socks, a red rag, a Lake and Trail jacket, and brown Ithaca men's boots.  (*Id.* at 29-30, 32-33, 35-38, 41.)  Orrison unloaded the weapon for safety, and he identified photographs showing the four spent casings and four live rounds taken from the revolver.  (*Id.* at 30-32.)

The court heard arguments concerning the admissibility of Anjanette Lewis' testimony about the statements made by Eddie Lewis to her.  (*Id.* at 50-67.)  The court held that all of the statements made by Eddie Lewis to Anjanette Lewis were admissible as statements against penal interest.  (*Id.* at 68-73.)  The court also held that it did not need to advise Anjanette Lewis of her Fifth Amendment rights.  (*Id.* at 73.)

Anjanette Lewis testified that she had been married to Eddie Lewis for two years and that Petitioner had introduced Eddie to Anjanette.  (*Id.* at 75-76.)  On February 1, 2006, she was playing on the computer in her son's room when Eddie Lewis came home.  (*Id.* at 76.)  Eddie had blood on his clothing and face, and cut on his left cheek.  (*Id.* at 76, 92, 124.)  She asked what had happened, and Eddie said that something bad had happened.  (*Id.* at 77.)  Eddie Lewis told Anjanette that he shot a man five times and was worried that he killed him.  He said that he went to the man's house to rob him of drug money, but the man had jumped and attacked him, so Eddie shot him.  Eddie told Anjanette that he was with Danny and the robbery was set up by Doug.  (*Id.* at 78.)  She knew that "Doug" was Petitioner, Doug Weissert.  (*Id.* at 79.)  Eddie told her that he had to get rid of the evidence.  He took a shower, changed his clothes, and put the other clothes and things in the car.  (*Id.* at 80.)  Anjanette was shocked and scared.  They waited until the children got on the bus,

then Eddie stated that he wanted to bury the gun and his clothes at her parents' cabin in Hesperia. (*Id.* at 80-81.) She went along, because was afraid of him; he had abused her in the past. They took her 1992 Pontiac Grand Prix, and Eddie drove. (*Id.* at 81.)

As they drove, Eddie told her more about what happened. He stated that he and Danny went into the house through the sliding door. (*Id.* at 82.) Eddie told her that Doug had set it up and that Eddie and Danny were supposed to get the drug money. (*Id.* at 83.) Eddie reported that Doug knew about the drug money because he bought his drugs from Frank. (*Id.* at 84.) Eddie stated that Doug and Frank were good friends and that Doug had gotten Frank to say when he was making his next trip to Chicago. (*Id.* at 86.) According to Eddie, they had first planned to do the robbery sometime in January, and that Doug had come up with a new date. (*Id.* at 87.) When Eddie and Danny entered the house, the couple was in bed, and Eddie put the gun to Frank's head. (*Id.* at 83.) Frank jumped Eddie, and they struggled. (*Id.*) Danny held the woman back, because she was trying to give a knife to her husband. (*Id.* at 82.) Frank attacked Eddie, and Eddie shot Frank in the leg. When that did not slow Frank down, Eddie shot Frank in the stomach, then in the shoulder, and finally in the chest. (*Id.* at 83.) When Eddie and Anjanette got to Hesperia, Eddie got out of the car, went to the shed, and got a shovel. He then headed to the creek area and came back 10 or 15 minutes later. (*Id.* at 84.) They drove home, passing by the houses of Doug and Danny on their way. (*Id.*) The day after they drove to Hesperia, Doug came over to Eddie and Anjanette's house in the late morning. She saw him when, after she heard the dogs barking, she peeked out the kitchen window. (*Id.* at 89.) She saw Doug's truck and Doug, who was talking to Eddie. They spoke for about 20 minutes. (*Id.* at 90.)

Anjanette testified that Eddie and Doug were very good friends.  They had had a falling out in the summer of 2004, but they had since become close again.  Eddie frequently told her that he would go over to Doug's.  (*Id.* at 88.)  Anjanette explained that she went to Hesperia with Eddie because she felt she had no choice, given that he had been physically violent with her and had tried to strangle her on another occasion.  (*Id.* at 90.)  She had called the police on at least one occasion.  (*Id.* at 91.)  Anjanette also testified that, about a month after the shooting, she learned about a Silent Observer reward.  (*Id.* at 92.)  She contacted Chief Schrumpf about applying for the reward, and she ultimately received $1,000.00.  (*Id.* at 93.)  The car she had owned prior to her marriage was seized pursuant to the search warrant, and she later owed impound and towing fees, for which she was originally charged $450.00, but she got $300.00 back from the Muskegon County Sheriff's Department and paid only $150.00.  (*Id.* at 94, 128.)  When she first talked to the police, she did not say anything about Danwood and Doug, despite repeated questioning about Eddie's accomplices, because she was afraid of Doug, based on threats Eddie had relayed to her.  More than halfway through her police interview, she finally mentioned Danny and Doug.  (*Id.* at 97, 114-16.)  Defense counsel vigorously cross-examined Anjanette about, among other things, her failure to call the police, her participation in the disposal of the evidence, and the fact that she only told the police weeks later, on February 28, 2006, after she had called to report a domestic violence incident.  (*Id.* at 99-105.)  Counsel also extensively impeached her with both her preliminary examination testimony and her statement to the police.  (*Id.* at 105-23.)

Muskegon County Undersheriff Dean Roesler testified Chief Schrumpf, not anyone from the prosecutor's office,  contacted him about paying the $1,000.00 Silent Observer reward.  (*Id.* at 132-33.)

- 25 -

Dr. Michael Markey was qualified as an expert in forensic pathology.  (*Id.* at 137.)
Markey conducted the autopsy of Frank Sibson.  (*Id.* at 140.)  Markey identified photographs of
Frank Sibson's injuries.  (*Id.* at 141-55.)  Sibson had a contact gunshot wound to his left chest.  The
bullet passed through his heart, lungs, liver and diaphragm and lodged in his right back  (*Id.* at 143-
47.)  A second gunshot was discharged a small distance from the skin, and the bullet entered the
right side of his abdomen, perforated some loops of the intestine, and penetrated the chest wall, but
did not exit.  (*Id.* at 147-50.)  Another shot was fired in close contact with the front of Sibson's left
thigh, and the bullet was found in his left buttock.  (*Id.* at 150-52.)  Yet another gunshot entered the
lateral side of his left thigh and exited the back of his left leg.  (*Id.* at 154.)  He also had a non-
penetrating gunshot wound on his left bicep, as well as abrasions and/or bruises to his left elbow,
the back of his head, the right shoulder, the left side of his neck, his back, and the left side of his
face, nose and eye.  (*Id.* at 152-58, 164-65.)  Three bullets were recovered during the autopsy.  (*Id.*
at 165.)  The toxicology report indicated that Sibson's blood contained cocaine and two cocaine
metabolites, but no other drugs.  (*Id.* at 158-59, 169.)

Markey concluded that Sibson had died from multiple gunshot wounds, the most
significant of which was the shot through the chest.  (*Id.* at 160-61.)  Markey testified that the
amount of rigor mortis found in the body was unusual but not highly atypical for the hour and 36
minutes that had passed between the reported time of the incident and the examination by the
medical examiner investigator.  (*Id.* at 179.)  One of the things that can accelerate rigor mortis is
strenuous physical exertion prior to death.  (*Id.* at 188.)  Also cocaine can accelerate rigor mortis.
(*Id.* at 191.)  Both the EMS unit and the hospital ran rhythm strips to measure electrical activity of
the heart, and the strips from both locations appeared to indicate electrical activity of the heart,

- 26 -

though without heart beats.  (*Id.* at 184-85.)  Markey testified that, based on all factors, he did not

have any reservations about the time of death.  (*Id.* at 187.)

Officer James Sliter testified that, at 4:14 a.m on February 1, 2006, he was dispatched

on a call reporting a shooting at 1521 South Mill Iron Rd.  He responded using lights and sirens, and

he arrived in four minutes.  (*Id.* at 199-200.)  After learning that the shooter was gone, Sliter walked

to the back of the house and entered through the sliding door to the dining area.  (*Id.* at 201.)  He

found a woman in her nightclothes who was hysterical, screaming and crying.  She had blood on her

pants and socks.  (*Id.* at 202.)  Sliter walked into the house and saw the victim, who appeared to be

dead.  The woman was on the phone and appeared to be trying to get instructions for CPR.  When

the firefighters arrived, Sliter took Danielle into another room.  (*Id.*)  He interviewed her to get as

much information as possible.  Danielle told Sliter that she and Frank Sibson had gone to bed at

about 11:10 p.m.  They had been awakened by two males who were in the bedroom, yelling at them

to wake up and asking where the money was.  She reported that the assailants were white males with

voices that sounded like they were 20 or 30 years old.  (*Id.* at 203.)

Danielle told him that Frank "freaked out" and charged at the men and then Frank

pushed one or both of the men into the kitchen or hallway between the bedroom and kitchen.  She

heard a shot go off, so she jumped on the back of one of the men.  The assailants were both wearing

masks, one that she believed was orange and the other she believed was camouflage.  (*Id.* at 205.)

Danielle described the assailant holding a silver handgun.  (*Id.* at 209.)  On a later date, Eddie Lewis

instructed Sliter to go to Stone Road in the Hesperia area of Newaygo County.  Sliter went to the

address with troopers Coon and Dunlap and Muskegon Detective Orrison to search for certain items.

Some officers remained that night and Sliter to the Hesperia address returned in the morning,

February 28, 2006, escorting Eddie Lewis.  (*Id.* at 208, 217.)  Sliter was present when the items were found at the Stone Road address.  (*Id.* at 209.)

Ralph Meyers testified that, at the time of his testimony, he was charged by the Muskegon County Prosecutor's Office with conspiracy to deliver marijuana with Frank Sibson, Petitioner and others, and he was testifying pursuant to a plea agreement.  Under the agreement, in exchange for his truthful testimony, he would not be charged with the marijuana found in his house or with felony firearm.  (*Id.* at 221-22.)  Meyers also acknowledged that he was not being charged for delivering marijuana on as many as 60 occasions when he purchased for friends over the years. (Tr. VII at 14.)  Meyers testified that he lived at 1490 Duck Lake Road, which is across the street and very near Petitioner's address at 1501 Duck Lake Road. (Tr. VI at 222-23.)  He had known Petitioner for approximately 11 years.  (*Id.* at 223.)  He was introduced to Eddie Lewis by Petitioner six or seven years earlier.  (*Id.*)  At times, Meyers had helped out Eddie Lewis, and Lewis had resided with him.  (*Id.* at 224.)  Meyers also met Danwood Durst through Petitioner.  (*Id.* at 225.)

In addition, Meyers was Petitioner's friend and had helped Petitioner with home building projects and had watched his house when he was gone.  (*Id.* at 224-25.)   He had also bought a shotgun from Petitioner, and Petitioner left a gun in Meyer's keeping.  (*Id.* at 225.)  Meyers had been at Petitioner's house for target shooting a number of times, where Petitioner shot at a target placed on a stump farther back on his property.  Meyers identified Exhibit 208 as an Armenius, 8-shot German pistol that had two different serial numbers on it.  (*Id.* at 226-27.)  Meyers bought the pistol from Floyd Smith and later sold it to Petitioner.  (*Id.* at 227.)  Before Petitioner bought it, he borrowed it from Meyers and told him he was going to target practice with it.  (*Id.* at 227-28.)  Petitioner came back and said that he liked it, and Meyers sold the gun to Petitioner that day.  (*Id.*

at 229.)  Meyers told Petitioner that it was a non-registered gun, but it was not hot, as Meyers had checked the numbers.  (*Id.* at 230.)  At other times, Eddie Lewis, Petitioner and Meyers would shoot guns into a beam inside Meyers' house.  (Tr. VII at 30.)

Meyers purchased marijuana from Petitioner for five or six years, typically an ounce at a time for $100.00 to $140.00 per ounce.  Meyers testified that he had seen Petitioner with as much as approximately 1/4 pound.  (Tr. VI at 231.)  Meyers sometimes purchased an ounce for other people, including Mr. Givens and Mr. Ferguson, whose names he had given police.  (*Id.* at 232.)  When someone asked him, he would walk across the street and buy the marijuana from Petitioner or Jamie.[3]  He bought from either Petitioner or Jamie 10 to 12 times each year.  (*Id.* at 234.)  On about January 20, 2006, Petitioner came to Meyers to ask him to do a job with Eddie Lewis, though he did not describe the job.  (*Id.* at 235.)  Meyers told Petitioner no, and Petitioner said that he would get Danny to do it.  (*Id.* at 236.)  After February 1, 2006, Petitioner stopped selling marijuana to Meyers.  (*Id.* at 235.)  Petitioner came over to Meyers' house around February 1, 2006, saying that "he thought he had screwed up and screwed up royal."  (*Id.* at 236.)  The following day, Petitioner told Meyers that he had cut himself at work and he thought he would "have to piss test."  (*Id.*)

When the police searched Petitioner's house, Meyers initially thought that Petitioner was being robbed, as the police used unmarked vehicles.  Meyers ran across the street with a baseball bat to see what was going on, and the police told him to go home.  (*Id.* at 237.)  Meyers went back to his house and hid the .22 Magnum handgun that Plaintiff had given him to use for personal protection, which Petitioner still owned and occasionally took back for practice or hunting.  (*Id.* at 238.)  Meyers identified a bag of marijuana that police seized from his house.  Meyers

---

[3]Petitioner's wife's name at an earlier hearing was recorded as "Jami," but the Court has used the spelling recorded in the trial transcript.

testified that he did not get the marijuana from Petitioner. (*Id.* at 239.) He also identified another bag, some joints, and a brown pipe, all found next to his couch. (*Id.* at 240.) Meyers testified that, sometime after February 1, 2006, while he was riding his four-wheeler behind Petitioner's house, he realized that the target stump had been burned out. The burned-out spot was not covered by the snow. (*Id.* at 241.)

Michigan State Police Fire Examiner Beth Clark was certified as an expert in fire arms and tool marks. (Tr. VII at 59.) As part of the crime scene response team, she went to the scene at 1521 Mill Iron Road, together with Tom Flowers (prints), Kirk DeLeeuw (DNA ), Dave Hurst (serology) and Paul Donald (forensic scientist). (*Id.* at 60-61.) After obtaining a search warrant, the team entered through the rear of the home. (*Id.* at 65.) She saw spilled dog food and blood on the kitchen floor. In the hallway to the left, what appeared to be a handgun, later identified as a BB gun, was on the floor. In both places there appeared to have been a struggle. (*Id.* at 66.) She seized the black and silver BB pistol. (*Id.* at 67-68.) A single BB pellet and the magazine of the BB gun were found in the hallway. (*Id.* at 68-69.) After noticing a small hole in the bedroom ceiling above the bed, she cut a piece of the drywall, in case it contained a projectile. (*Id.* at 69-70.) Other evidence was collected by other members of the team. (*Id.* at 67, 72.) The team was at the house from 10:00 a.m. to 2:45 p.m. (*Id.* at 73.)

After testing, Clark could not determine whether a gun shot had passed through the drywall. (*Id.* at 77.) Clark examined the bullets recovered from Sibson's body and determined that they were .22 caliber bullets. (*Id.* at 82.) She eventually compared them to .22 caliber bullets fired from the German handgun Eddie Lewis buried, and she determined they had similar lands and grooves. (*Id.* at 92-93.) Clark testified that it was her opinion, to a reasonable degree of scientific

certainty, that the bullets found in Frank Sibson's body were fired from the German handgun she tested.  (*Id.* at 94.)  She also found gunshot residue on the boxer shorts cut from Frank Sibson that was deposited during a contact or near-contact gunshot; in other words, the gun was fired from within two inches of the shorts.  (*Id.* at 99, 118.)  In addition, Clark examined cartridge cases submitted into evidence against cartridge cases taken when she fired sample shots from the German revolver, but she could only say that some of them were of the same caliber and left a similar round firing-pin impression.  (*Id.* at 106-07, 128.)

       Michigan State Police forensic scientist Paul Donald was qualified as an expert in DNA analysis.  (*Id.* at 184.)  Because of the limits on laboratory capacity and cost, lab policy is to limit DNA analysis to seven evidentiary (unknown) samples and the necessary reference (known) samples for comparison.  (*Id.* at 193-94.)  Donald analyzed the samples taken from Frank Sibson's fingernails and left thigh and blood samples recovered from the house.  (*Id.* at 195.)  All of these samples either matched or were consistent with a mixture of the DNA of Frank Sibson and Danielle Sibson.  (*Id.* at 195-98.)  Donald testified that it was not surprising to find DNA from a one spouse living in the same house under the other spouse's fingernails.  (*Id.* at 198.)  Donald also analyzed a swab taken from the trigger and hammer of a .22 caliber gun, a swab taken from a mask, and samples taken from a mask and brown gloves.  He compared the DNA obtained from those samples to the DNA samples obtained from Petitioner, Eddie Lewis and Daniel [sic] Durst.  (*Id.* at 200-01.)  Because of insufficient or degraded DNA or inhibitors (such as dyes), no DNA profile was performed.  However, the DNA was sufficient to determine that Eddie Lewis, Dan Durst and Petitioner were all excluded as donors.  (*Id.* at 201-04.)

- 31 -

On the morning of the eighth day of trial, the prosecutor moved to admit belatedly discovered evidence of a conspiracy on January 30, 2006, between Petitioner, Durst, and Eddie Lewis, to steal an all-terrain vehicle (ATV) or golf cart.  Durst was to receive $500.00 in exchange for his participation in the plan, the same as he was to receive for the robbery of Sibson 36 hours later.  The evidence was relevant under Michigan Rule of Evidence 404(b), to the government's claim of conspiracy to rob Lewis, as well as to intent, knowledge, and the existence of a common scheme or plan.  (Tr. VIII at 3-9.)  The court determined that the evidence was admissible.  (*Id.* at 11-13.)

Michigan State Police Sergeant Thomas Flowers testified as a latent and known fingerprint expert.  (*Id.* at 18.)  Flowers testified that he obtained latent prints from the trashcan lid found at Sibson's house, but those prints did not match the prints of Petitioner, Durst, or Eddie Lewis.  (*Id.* at 25-27.)  Numerous other items were examined for prints, but none was found.  (*Id.* at 29-31.)  Flowers found prints made inside the driver's door of a vehicle, which matched those of Eddie Lewis.  (*Id.* at 32.)  Other fingerprints found in the vehicle could not be matched to any known subject.  (*Id.*)

Marion Arnett testified as the custodian of records for Verizon Wireless as to the telephone call history of cell phone number 231-670-1296[4] for the late evening of January 31, 2006 to the early morning of February 1, 2006.  (*Id.* at 49-60.)  On January 31, 2006, a call originated from the phone to number 766-2443, through a cell phone site on Russell Road.  The call began at 10:38 p.m. and lasted for 24 seconds.  (*Id.* at 53.)  Another call lasting 39 seconds was made from the phone on February 1, 2006 at 12:14:14 a.m. to mobile number 557-4399, connecting through a cell

---

[4]Subsequent testimony demonstrated that the number was that of Danwood Durst's cell phone.

tower on Gibson Road in Whitehall.  (*Id.* at 54.)  At 12:15:48 a.m., the number received a call from

mobile number 557-4399.  (*Id.* at 56.)  Another call lasting 36 seconds was made from the phone

in question at 1:19:28 a.m. on February 1, 2006 to 766-2443.  (*Id.* at 57.)  Mobile phone number

557-4399 belongs to Kelly Hawkins.  (*Id.*)  At 1:37:56 a.m. on February 1, 2006, a call was placed

from the phone to 557-4399, and the call lasted 178 seconds.  (*Id.* at 58.)  At 1:40:44, an incoming

call was received from 231-766-2443, a non-mobile number, and the call lasted 40 seconds.  (*Id.*)

Anthony Givens testified that he had been to Ralph (Dusty) Meyers' house on

multiple occasions to buy marijuana.  (*Id.* at 63.)  Givens purchased marijuana from Meyers every

couple of months during a three or four-year period.  (*Id.* at 64.)  When Meyers did not have the

marijuana, he would tell Givens that he would be right back, and he would go out his front door and

return within five or ten minutes with an ounce of marijuana.  (*Id.* at 65, 67.)  One time, he

mentioned that he had to run to the neighbors.  (*Id.* at 66.)  On cross-examination, Givens

acknowledged that he had not been criminally charged with possessing marijuana for any of the

occasions on which he admitted purchasing it.  (*Id.* at 73.)

Fruitport Police Department Detective James Schultz testified that he participated in

the search of 1505 Duck Lake Road on February 28, 2006, and he was the evidence officer who

completed the search warrant return, making note of each item seized and where it had been found.

(*Id.* at 86-87.)  Schulz seized $2,500.00 found in the bedroom gun cabinet.  (*Id.* at 88.)  He also

seized a number of long guns, including a Marlin .22 caliber rifle, which was the only gun physically

brought into the courtroom.  A photograph of all guns was introduced into evidence.  (*Id.* at 88-90.)

Schultz also seized paperwork related to a pistol permit and the purchases of a Colt .44 automatic,

- 33 -

a 7-shot .45 caliber handgun, a 6-shot Colt .357 caliber revolver, a .22 caliber pistol, a 6 mm Beretta automatic pistol, a 6-shot .44 Colt Magnum revolver, a 2-shot Davis .38 single-action pistol, and a Taurus .38 caliber pistol. (*Id.* at 91-94.) He also identified the Taurus .38 caliber handgun and an open box of .22 caliber cartridges, which had been seized from the gun cabinet. (*Id.* at 95-96.) He seized about 400 hundred rounds of 7.62 mm SKS cartridges. (*Id.* at 97.) No drug records were found in the home. (*Id.* at 100.)

Danwood Durst testified that he originally was charged with open murder, including first-degree felony murder, but he pleaded guilty to second-degree murder, in exchange for his testimony at Petitioner's trial. (*Id.* at 109.) He had no agreement on his sentencing, but the prosecution had agreed to inform the sentencing judge of his cooperation. (*Id.* at 110.) Durst testified that he had known Petitioner for 10 or 11 years and was good friends with him. He met Eddie Lewis through Petitioner, and he had known Lewis for eight or nine years. (*Id.* at 111.) Thirty-six hours before the homicide, Durst spoke to Petitioner about needing $500.00 to pay a lawyer for child custody matters. (*Id.* at 112-14.) Petitioner suggested he, Durst and Lewis steal an ATV, for which Durst would be given his share of the money from the sale. (*Id.* at 113-14.) Durst expected to receive about $500.00 as his share. The three men drove around for several hours that night, looking for the ATV, but they could not find it. They left Durst's house between 11:00 p.m. and midnight, and Durst drove down multiple roads, with either Petitioner or Lewis directing him. (*Id.* at 115.) While they were out, they rummaged some things, including a vacuum and a fogger, from a cabin and a shed. (*Id.* at 117.) Durst kept a couple of things, but he did not get the $500.00 he needed. (*Id.* at 118-19.)

- 34 -

That night at about 10:30 p.m., Durst called Petitioner from his cell phone (670-1296), asking about borrowing $500.00. Petitioner told Durst that he would be over in a short while. (*Id.* at 119.) Durst's friend Kelly subsequently called to see if Durst could get her some Vicodin, and Durst called Petitioner about getting it. (*Id.* at 125.) Petitioner arrived at Durst's home at about 11:30 p.m., accompanied by Ed Lewis. (*Id.* at 120-21.) Durst's girlfriend, Rebecca Patowski, also was at his house. (*Id.* at 120.) The home was in Fruitland Township on Lorenson Road, between North Muskegon and Whitehall. Durst invited the men in, and they went to the kitchen, where they looked at the paperwork related to his child-custody matter, referring to Durst's ex-girlfriend as a bitch. (*Id.* at 121-22.) Patowski remained in the living room, which is next to the kitchen. Petitioner then waived the others to the basement, where they discussed a robbery. (*Id.* at 122.) Petitioner said, "[T]here's this punk making too much money." (*Id.* at 123.) Petitioner told Durst that, if he went with Lewis and drove, he would get the money he needed in the morning. (*Id.*) Patowski left Durst's house, mad, because Durst would not buy her tampons, though he planned to go out. (*Id.* at 127-28.)

Petitioner drove the three men to a gas station and then went to sell the Vicodin to Kelly. (*Id.* at 125-26.) They returned to Petitioner's house. Lewis and Durst then drove Lewis' car to Durst's house, arriving at approximately 1:30 a.m. (*Id.* at 126-27.) They stayed at the house for about an hour and a half. At some point during that time, Durst thought that Patowski returned and went to bed. (*Id.* at 128.) At about 2:30 p.m., the men drove Lewis' Grand Prix to Wesco on Apple Avenue to get gas. Durst drove because Lewis did not have a driver's license. (*Id.* at 129.) While Durst pumped gas, Lewis used Durst's phone to call Petitioner to get a key. (*Id.* at 131, 190, 192.) Durst had no other calls on his phone after Lewis called Petitioner. (*Id.* at 131.) When they left the

- 35 -

gas station, they drove to Petitioner's house.  (*Id.* at 130.)  When they arrived, Lewis walked behind

Petitioner's house and then returned a few minutes later and put something in the trunk.  Durst did

not see Petitioner or his wife.  (*Id.* at 130.)  Lewis then directed Durst to the Sibson's house on Mill

Iron Road, and they arrived at approximately 3:00 or 3:30 a.m.  (*Id.* at 131.)  Lewis told Durst to

park at the back of a shop on Laketon Avenue.  Lewis popped the trunk and removed a revolver, a

BB pistol, masks, gloves, and a pickax.  (*Id.* at 132.)  Lewis gave Durst an orange mask and black

gloves, and Lewis had a camouflage mask.  (*Id.* at 133.)  Durst carried the BB pistol.  Lewis carried

the revolver and a pickax.  (*Id.* at 137.)  Durst watched Lewis load the pistol with cartridges taken

from a cardboard box.  (*Id.* at 133-34.)  Both men put on their masks and gloves.  (*Id.* at 134-35.)

They walked through the woods to the back of the house.  (*Id.* at 135.)

From comments Petitioner had made to him in Durst's basement, Durst thought that

the man they were robbing was unlikely to fight back.  (*Id.* at 136.)  Lewis led the way across the

deck to a sliding door.  (*Id.* at 137.)  Lewis put the pickax by the deck railing, opened the sliding

door, and walked in.  (*Id.* at 139.)  Durst followed about six or eight feet behind.  When he walked

in, he could not see Lewis, but he heard his voice.  (*Id.* at 140.)  Durst walked down the hallway to

a bedroom, where he found Lewis pointing the revolver and yelling at Frank Sibson.  (*Id.* at 141.)

Durst had the BB pistol in his pocket.  When he arrived, no one was in the bed, and he did not see

anyone else in the room.  (*Id.* at 142.)  Frank Sibson then attacked Lewis.  Durst heard a shot, and

Danielle Sibson jumped on Durst.  (*Id.* at 143.)  Durst struggled with Danielle Sibson, who had

grabbed him by his clothes,  and she pushed him into a closet outside the room.  (*Id.* at 144-45.)

Durst did not know if he fired the BB gun during the struggle.  (*Id.* at 148.)  Durst heard Lewis yell,

"[W]here's the money at fat f***?"  (*Id.* at 144.)  By the time Durst got Danielle Sibson off him,

Lewis and Frank Sibson were in the kitchen.  (*Id.* at 145.)  Durst heard a second shot when Lewis and Frank Sibson were in the kitchen.  (*Id.* at 218.)  Durst headed for the door.  (*Id.* at 145.)  As he went toward the door, he heard Lewis say, "Help me Danny."  (*Id.* at 146.)  Durst picked up a metal container and hit Frank Sibson in the head.  (*Id.* at 146-47.)  He then ran out the door.  He did not hear any additional shots.  As Durst climbed a fence to get back to the car, he saw Lewis running toward the fence, carrying the pickax or splitting maul.  Durst left the BB pistol at the house.  (*Id.* at 147.)

At the car, the men threw their things into the trunk, and Durst drove the vehicle away.  As they drove, Lewis was freaking out, saying, "I don't believe I had to shoot him.  He attacked me."  (*Id.* at 148.)  Durst responded, "Holy shit, what happened."  (*Id.*)  When they got back to Durst's house, Durst went inside and Lewis left.  (*Id.* at 149.)  Durst tried to calm down and sleep, but he merely dozed.  Durst identified the mask Lewis wore and the gun Lewis used.  (*Id.* at 149-50.)  At about 8:00 a.m., Petitioner pounded on Durst's door.  Durst answered, though his girlfriend remained in bed.  Petitioner asked Durst to go outside to talk with him.  As they sat in Petitioner's red Ford pick-up, Petitioner told Durst that the man Lewis shot had died.  (*Id.* at 150.)  Petitioner asked Durst to either burn or bury the mask and gloves he had worn.  Petitioner also stated, "I don't believe that dumb fuck Ed got greedy and went in the house."  (*Id.* at 151.)  Petitioner also told Durst, "[L]oose lips, sink ships, to keep [his] mouth shut."  (*Id.*)  Petitioner told Durst that Lewis and Durst were only supposed to go into the garage.  Durst had never before heard anything about the garage.  (*Id.*)  Durst buried the mask and gloves at his old residence, 1731 Russell Road.  (*Id.* at 152.)

When Durst first talked to the police, he did not tell them what had happened.  He then was placed in the same holding cell as Petitioner.  Petitioner told Durst to "[t]o tell the truth that Mr. Lewis was the master mind, that Ed was, that [they] were only supposed to go in the garage . . . ." (*Id.* at 153.)  Durst testified that Lewis was not the mastermind.  (*Id.*)  Durst believed that Petitioner was trying to place all of the blame on Lewis.  When he later talked to the police, Durst told them that the robbery was just supposed to be the garage.  (*Id.* at 154.)   Durst was extensively cross-examined about the discrepancies in his statements to the police and about his plea agreement.  (*Id.* at 155-228; Tr. IX at 4-22.)

Rebecca Pintoski testified that Danwood Durst had been her boyfriend and he had lived with her on Lorenson Road for about two months, including the dates relevant to the crime.  (Tr. IX at 33-34.)  She met Petitioner on five or six occasions during that time, and she went to Petitioner's house once.  (*Id.* at 34.)  Pintoski also went to Eddie Lewis' house on one occasion.  She had seen Lewis, Durst and Petitioner together.  Pintoski kept a journal during that time, though she did not write in it every day.  On January 30, 2006 at about 10:30 p.m., she saw Petitioner and Lewis at the house she shared with Durst.  (*Id.* at 35.)  They subsequently left and did not come back until 5:30 a.m.  (*Id.* at at 36.)  Durst told her that they were going to steal a quad and Petitioner was going to pay Durst $500.00 to steal it.  (*Id.* at 42.)  Pintoski was angry at Durst when he left.  She made an entry in her journal about her feelings.  When Durst returned home, he had a vacuum, a knife set, and some other little, odd things.  (*Id.* at 36.)  She saw all three men pull into the driveway, but only Durst came in the house.  She knew it was the others, because they had not taken Durst's car, a Jeep, but instead had taken a white Grand Prix, which she believed belonged to Lewis.  She knew that Durst had borrowed a trailer around that time, but she did not know if they took it with them.  (*Id.*

- 38 -

at 37.)  Durst asked Pintoski to go to Petitioner's house, but she refused.  Durst left again for about 20 minutes.

On January 31, 2006, she did not write an entry in her journal.  That evening, Durst picked her up from work, and they went back to her house on Lorenson.  (*Id.* at 38-39.)  Petitioner and Lewis then came over, driving, she believed, Lewis' car.  She was on the couch in the living room.  (*Id.* at 40.)  The men were in the kitchen for about five minutes.  Pintoski heard the men talking, but she did not hear the content.  The men then went to the basement for about 15 or 20 minutes.  (*Id.* at 41.)  All three men left the house a short time later.  She was still mad about the night before.  (*Id.* at 42.)  Before they left, Petitioner came in to the bedroom to talk to her at about 2:00 a.m.  (*Id.* at 47-48.)  Pinkoski asked Durst what was so important that he had to leave at 2:00 in the morning.  Durst told her that he could not really tell her, but he had some things to do.  She asked him to buy her some tampons, as long as he was going out.  (*Id.* at 43, 48.)  He refused.  (*Id.* at 46.)  The men were gone for a half-hour or an hour.  All three men came back and went into the kitchen.  Pinkoski left and went to the store.  When she got back, Petitioner was gone.  (*Id.* at 44.)  Lewis and Durst, however, were in the living room.  Pinkoski went into the bedroom.  (*Id.* at 46.)  They all left at about 2:00 a.m.  Pinkoski was awake when Durst got home at 4:30 or 5:00 a.m.  (*Id.* at 48.)  Durst acted "normal."  (*Id.* at 48-49.)  She did not see anything unusual.  Pinkoski identified Kelly Hawkins as a friend of Durst, who bought Vicodin from him.  (*Id.* at 49.)  Someone pounded on the door in the morning, and Durst answered the door.  (*Id.* at 49-50.)  Durst went outside, and Pinkoski saw Petitioner's truck in the yard.  (*Id.* at 50.)  Pinkoski testified that she had seen Durst with a pound of marijuana on one occasion, and Durst sold the pound to Petitioner.  (*Id.* at 50.)  She also knew that Durst sold to other people.  (*Id.* at 51.)

- 39 -

Robert Decker testified that he had been charged by the Muskegon County Prosecutor's Office of conspiracy with intent to deliver over 45 kilos of marijuana. Others in the conspiracy included Frank Sibson and Petitioner. (*Id.* at 66, 88.) Before being charged, Decker spoke with police, telling them what he had done with Mr. Sibson and Petitioner. (*Id.* at 66.) Decker also testified at Lewis' trial. He testified pursuant to a plea agreement under which the prosecutor agreed to fully and fairly inform the sentencing judge regarding his cooperation. In addition, though the police found both cocaine and hallucinogenic mushrooms at his home, the agreement provided that he would not be charged for possession of either or for felony firearm. (*Id.* at 67-68.) Decker testified that he was in the marijuana business with Sibson. Sibson would drive his van to Chicago four or five times per year and bring back 60 to 100 pounds of marijuana at a time. He typically payed $1,300.00 per pound. (*Id.* at 68-71.) Decker was involved in the marijuana sales for two years. (*Id.* at 70.) The marijuana would arrive in 20 to 25 pound bales, and Decker would go to Sibson's house to help break the bales down into one-pound Zip-loc baggies. (*Id.* at 71.) When they were repackaging the marijuana, Sibson indicated that they were packaging for Petitioner, Mike Molotke, Troy Rop, and Dale Bennett, as well as people Decker knew only by their first names. (*Id.* at 79.) Decker testified that he delivered $5,000.00 to the Sibson residence just before Frank Sibson's death. (*Id.* at 81.) Frank Sibson fronted the drugs to the people he sold to. (*Id.* at 85.) When he needed to get more marijuana from Chicago, he would call all of his sellers and ask them to pay up. (*Id.* at 86.) Petitioner was a friend of both Sibson and Decker, but Decker did not see Petitioner at Sibson's funeral. (*Id.* at 88-89.) Decker testified that everyone went to the garage to buy drugs and drop off money, but he knew that Sibson kept the money in his bedroom. (*Id.* at 89.)

- 40 -

Norton Shores Police Officer Gerald Mack testified that he found a Marlin .22 caliber bolt action rifle and .22 caliber hollow-point ammunition when he searched the garage of Eddie Lewis' home. (*Id.* at 115-16.) He also found a cigarette pack containing 18 Super X .22 caliber ammunition rounds in Lewis' kitchen hutch. (*Id.* at 117-18.) Mack also identified the black leather holster found in the trunk of Lewis' Grand Prix. (*Id.* at 118-19.)

Kelley Hawkins testified that she knew "Shorty," whom she identified as Danwood Durst. (*Id.* at 123.) There came a time when Durst's picture was in the paper. She had seen Durst for the last time three weeks before the picture ran in the paper. (*Id.* at 123-24, 128.) Hawkins had a very ill sister who would buy supplemental Vicodin off the street. They would call Durst's cell phone, and he would bring them around. (*Id.* at 124.) Hawkins identified her cell phone number, 557-9399, as the number on Durst's phone record. (*Id.* at 126.) She called him a number of times during the relevant period, to see if she could get pain pills for her sister. At about 11:00 p.m. or 12:00 a.m., Durst came to her house with two other people. They went into the kitchen, and she gave Durst money for five Vicodins. (*Id.* at 127.) They went to the dining room, where Durst introduced the others, and then the men left. (*Id.* at 128.)

Bernard Ferguson testified that, several times each year for three years, he visited Ralph (Dusty) Meyers to buy marijuana, usually an ounce at a time. (*Id.* at 141-43.) If Dusty did not have the marijuana, he would go across the street to get it. (*Id.* at 142.) Ferguson acknowledged that he was not being prosecuted on any drug charges. (*Id.* at 144.)

Muskegon Police Detective Clay Orison testified that he conducted a search pursuant to a warrant of Petitioner's residence on March 15, 2006. (*Id.* at 147.) He found a partially burnt stump about 100 to 150 yards behind the house. (*Id.* at 148.) He also found bullet fragments in the

- 41 -

stump.  (*Id.* at 149.)  Orison recovered three fired bullets and two .22 short caliber cartridge cases.
He found four additional .22 caliber casings 39 feet north of the burned stump.  (*Id.* at 150-51.)  He
found seventeen .22 caliber long rifle casings 23 to 25 feet north of the stump.  (*Id.* at 152.)  Orison
found three .22 long rifle caliber Super X fired cases.  (*Id.* at 153.)  Those cartridge cases were sent
to the lab.  (*Id.*)

Muskegon Township Police Detective Kenneth Sanford testified that his was the
initial responding agency to the 911 call from the Sibson's house.  (*Id.* at 167.)  After consultation
with his Chief of Police, he made a decision to call in the state police.  (*Id.* at 168.)  Police conducted
an initial walk-through search of the home.  (*Id.*)  At a later time, he returned to the house to attempt
to locate a missing bullet, be they did not find it.  (*Id.* at 170.)  Sanford testified that Danielle
Sibson's initial statements were scattered, as she was distraught.  He brought her back to the police
department an hour after he arrived at the scene and continued to interview her for 12 to 14 hours.
(*Id.* at 172-73, 175.)  Sometime later, he was advised by Officer Bartolameolli that a large amount
of money was found in the home, as well as drugs.  (*Id.* at 174.)  As the result of his interview, Frank
Sibson became a suspect in drug trafficking, and Sanford also suspected Danielle, because she had
not been forthcoming about the drugs.  (*Id.* at 175.)  Once they realized the size of the investigation,
they put out a call to other police departments for help.  (*Id.* at 177.)  They got help from Whitehall,
Muskegon Heights, the City of Muskegon, Muskegon County, and the Michigan State Police.  (*Id.*
at 178.)

On February 28, 2006, they obtained important information about the case and
executed a search warrant at Eddie Lewis' residence, Danwood Durst's residence, and Petitioner's
residence.  (*Id.* at 180-81.)  Sanford looked through Frank Sibson's cell phone contacts and found,

among others, Petitioner's phone number.  Neither Eddie Lewis nor Danwood Durst was listed in

Sibson's phone.  (*Id.* at 183-84.)  However, Durst's phone records showed several contacts from

Petitioner's phone.  (*Id.* at 185.)  Sanford measured the distance between the house and the garage

at 1521 South Mill Iron Road at 95 feet, 9 inches.  (Tr. X at 4.)  Sanford was present for the search

of Ralph Meyers' house and outbuildings.  The police opened every cabinet and closet and found

no grow operation.  (*Id.* at 4-5.)  Police decided not to remove the beam in Meyers' house into which

bullets had been fired, because the beam held up the entire house.  (*Id.* at 5-6.)  The police found no

evidence linking Danielle Sibson to Danwood Durst or Eddie Lewis.  (*Id.* at 7.)  Sanford learned at

some point that Danielle and Frank Sibson were at Eddie Lewis' house with Petitioner and his wife

on one occasion.  (*Id.* at 8.)  Sanford identified two .22 caliber rifles that were among the 14 total

weapons found at Petitioner's home.  He did not have them tested because evidence indicated that

a handgun, not a rifle had been used in the homicide.  (*Id.* at 10.)  The shell casings found at

Petitioner's residence were tested.  (*Id.*)

   Michigan State Police Detective Sergeant Gary Miles interviewed Petitioner on

February 28, 2006, and he recorded the interview.  (*Id.* at 56-57.)  The parties stipulated to the

admission of the recorded interview and the transcript of the interview.  (*Id.* at 57.)  In addition, the

parties stipulated to the admission of the taped telephone call between Petitioner and his wife on

March 1, 2006.  (*Id.* at 57-58.)  On the night of March 1 to March 2, 2006, Miles interviewed

Petitioner again at the Muskegon County Jail, and the video recording of the interview was

introduced.  (*Id.* at 59-60.)  All three recordings were played for the jury, and they had copies of the

transcripts.  (*Id.* at 62, 64.)

The parties stipulated to the fact that the plant material taken from the Sibson residence was marijuana. They also stipulated to the presence of psilocybine-containing mushrooms and chunks of cocaine. (*Id.* at 83-84.)

The prosecution then rested. (*Id.* at 86.) The defense moved for a directed verdict on all counts. (*Id.* at 86-90.) The court denied the motion as to all seven counts. (*Id.* at 95-97.)

The defense called six witnesses. Dennis Smith testified that he worked for Cannon of Muskegon Corporation and that Petitioner was one of the employees he supervised. (Tr. XI at 10.) Within three or four days of February 1, 2006, Petitioner incurred a minor injury at work, pinching his finger between a pry bar and a piece of steel. Under company policy, for a superficial injury of this nature, the employee was allowed to monitor it. If it worsened, the employee would be sent to the clinic for evaluation. (*Id.* at 11-12.)

Richard Fisher testified that he had known Frank Sibson for seven years. (*Id.* at 14.) Fisher and Sibson worked together and were best friends. Fisher would go over to Sibson's house and visit him in the garage, or pole barn, a couple of times each week, if he was in town. (*Id.* at 15.) While in the pole barn, Fisher could observe the activities occurring in the barn, and he overheard phone calls Frank had with others. (*Id.* at 16-17.) In 2005 and early 2006, Fisher became aware of Sibson's marijuana sales. (*Id.* at 18.) Fisher testified that the marijuana and sales were kept separate from the house and remained in the barn. (*Id.* at 19.) Fisher acknowledged that he had seen marijuana in Sibson's house, usually in the amount of a joint. (*Id.* at 21.) Fisher saw a lot of money in the house, and he had seen $1,000.00 in the pole barn when Sibson was counting it. (*Id.* at 21-22.)

Michael Mayette testified that he was a fire fighter lieutenant at Muskegon Township Fire Department on February 1, 2006.  (*Id.* at 23.)  He was called to 1521 Mill Iron Road at about 4:00 a.m.  (*Id.* at 24.)  He responded in the fire engine, and he went inside the home through the back door and into the kitchen, followed by the Chief, Deputy Chief, and some part-time fire fighters. A man was lying on the kitchen floor, and the men began their assessment.  (*Id.* at 25.)  They found no breathing or pulse, so they attached their AED or defibrillator, which assessed the patient to determine whether there existed a shockable rhythm, and the machine reported that a shock was not advised.  (*Id.* at 26-27.)  During the six years he had used the AED, he had become familiar with its analysis.  (*Id.* at 28-29.)  If the patient has a programmable rhythm, the machine will not shock.  If the patient has no heart activity or has not for awhile, it may not shock either.  (*Id.* at 29.)  The machine did not recognize a shockable rhythm.  (*Id.* at 33.)  The machine instructed him to check for a pulse and, if no pulse was found, begin CPR.  (*Id.* at 33-34.)  He and Officer Doug Harris began CPR.  After one minute, the machine prompted them to stand clear so that it could analyze the patient again.  (*Id.* at 34.)  While inserting an oral airway through the mouth, they had difficulty, as the neck and jaw area were kind of stiff.  (*Id.* at 35.)  Normally, the head moves quite freely, but in this case the head and neck moved as a unit.  Once Pro Med arrived, they attached their own heart monitor, and Mayette continued chest compressions under their direction.  (*Id*. at 36-37.)  Mayette checked again for a pulse after he had done CPR, but he found none.  Mayette noted a dried substance on the floor that appeared to be blood.  (*Id.* at 38.)  Mayette acknowledged that he had no training to interpret the meaning of the AED prompts or the causes of Sibson's stiff jaw.  (*Id.* at 39.)

Cheryl Mosher testified that she was a member of the Professional Med Team (Pro Med) for over eight years, and she had been a paramedic for a total of fifteen years.  (*Id.* at 42-43.)

She and her partner were called to the address on Mill Iron Road at about 4:20 a.m. on February 1, 2006.  They were directed by police to the back of the house and through the slider into the kitchen, where they found a person on the floor.  (*Id.* at 43.)  When they arrived, they were told that the AED had not fired, meaning that there was no normal rhythm detected.  First responders were giving chest compressions and respirations, and they had placed an airway in his mouth and were attaching an oxygen mask to the victim.  (*Id.* at 44.)  They brought in their monitor to get a reading to determine why the AED had not fired.  They also looked for wounds, assessed the victim's pupils, which were fixed and dilated.  (*Id.* at 45.)  Because the monitor showed an angular (agonal) heart rhythm, because they found no carotid or radial pulses and no respiratory effort on his own, and because of his dusty, pale skin color, she determined that he was dead.  (*Id.* at 50, 52.)  She noted discoloration and mottling on the back of his shoulders and his buttocks, where he had been lying on the ground.  His jaw was stiff, preventing them from putting the tube in.  Overall, she noted that everything was stiff.  They had to make the decision whether to conduct advanced life support, including all medications and electrical therapy, or basic life support, which had been being conducted.  (*Id.* at 53.)  Mosher also testified that the EKG strips would record CPR movement and any other movement to the body or the cables.  (*Id.* at 54-55.)  Sibson was moved to look for wounds and CPR was conducted.  (*Id.* at 55-56.)  Mosher talked to Dr. Chase at Hackley Hospital conveying the findings.  They were instructed to transport Sibson, and they began full advanced life support.  (*Id.* at 54, 56.)  Mosher testified that she was never subsequently contacted by Dr. Markey or by medical investigator Matt Kempf about her observations.  (*Id.* at 57.)  On cross-examination, Mosher acknowledged the limitations of her training and her inability to determine other causes of the

conditions she found, and she acknowledged that doctors routinely review strips that are taken when the patient has CPR and has been moved.  (*Id.* at 61.)

Ralph Meyers was recalled to the stand.  He denied offering to sell the German handgun to Dwight Cummings or telling him that he had traded the gun and a weight bench to Eddie Lewis for the Dodge Raider.  (*Id.* at 63.)

Dwight Cummings then took the stand.  He testified that he had known Petitioner since 1998, when they worked together at Cannon.  Cummings no longer worked there, but he continued to be Petitioner's friend, sharing interests in sports, fishing and hunting.  (*Id.* at 65.)  They went fishing and deer hunting together.  (*Id.* at 65-66.)  Cummings got to know Meyers through Petitioner about seven years earlier.  Meyers did ceramic tile work on Cummings' house.  (*Id.* at 66.) Cummings had been to Petitioner's house at 1505 Duck Lake Road and to the acreage behind it on prior occasions.  (*Id.* at 66-67.)  He also had fired weapons at the property, most recently in January 2006, in the company of Petitioner and his two sons.  In January 2006, Cummings used a 12-gauge shotgun.  (*Id.* at 67.)  They did not fire into a tree stump, but there was a burned down tree stump with a tree right behind it.  They fired into the tree.  (*Id.* at 68.)  Cummings testified that, when Meyers was over at his house doing tile, Meyers brought the German handgun and offered it to Cummings for sale at $100.00.  (*Id.* at 68-69.)  Cummings was looking for a gun for his fiancée. He looked at the gun and asked if it could be registered, but he noticed that the gun had two serial numbers, so he thought the gun had been put together, and he was not interested.  (*Id.* at 69.)  Three or four months later, Cummings saw Meyers again, and he noticed that Meyers had a new, used Raider truck.  (*Id.* at 70.)  Meyers told Cummings that he had traded Lewis the German gun and a weight bench for the Raider.  Cummings told Meyers that he got a good deal.  (*Id.* at 71.)  On cross-

- 47 -

examination, Cummings testified that he had not talked to Petitioner since his arrest.   As

impeachment, the prosecutor played a tape of a call Petitioner made from the jail to Cummings' cell

phone.  (*Id.* at 79.)  In the call, Petitioner asked Cummings to talk to Petitioner's wife and to Meyers.

(*Id.* at 81.)  Although he was interviewed by the police, Cummings did not tell them that Meyers had

attempted to sell him the German gun.  (*Id.* at 83.)

On rebuttal, Detective Sergeant Gary Miles testified that he interviewed Dwight

Cummings on March 17, 2006, and he recently reviewed the transcript of the interview.  (*Id.* at 96.)

In the interview, Cummings told Miles about target shooting at Petitioner's home between January

15 and February 1, 2006.  Cummings told Miles that he fired his .12-gauge shotgun into a tree stump

behind Petitioner's home.   Cummings never described shooting over a burned-out tree stump into

a tree.  (*Id.* at 97.)

At the conclusion of trial, on December 20, 2006, the jury found Petitioner guilty of

all seven charged counts.  (Tr. XIII at 10.)   On January 24, 2007, Petitioner was sentenced to life

imprisonment for the felony-murder conviction, 17 to 25 years for the conspiracy conviction, and

three terms of two years for the felony-firearm convictions.  (Sentencing Transcript, (S. Tr.) at 36-

37, docket #40.)   No sentences were issued on the offenses of assault with intent to rob while armed

and first-degree home invasion, because of a concern about double jeopardy, given that those

convictions were the predicate offenses for the felony-murder conviction.  (*Id.* at 5-6.)

Petitioner, through appellate counsel, filed a motion for new trial, arguing that the

court erred in admitting both Eddie Lewis' preliminary examination testimony and Anjanette Lewis'

testimony about Eddie Lewis' statements to her.  In addition, Petitioner argued that trial counsel had

been ineffective in failing to preserve the constitutional basis for his objection to the admission of

the testimony. The court held a non-evidentiary hearing held on September 17, 2007. In an opinion

and order issued on October 25, 2007, the court denied Petitioner's motion for new trial.

By stipulation of the parties, the court held a new sentencing hearing, because of

intervening case law that eliminated the double jeopardy issue that the court had attempted to avoid

in its original sentence, when it did not assign a sentence for counts three and four, assault with

intent to rob while armed and first-dgree home invasion. (Resentence Hr'g Tr. at 4-6.) The court

resentenced Petitioner on the felony-murder, conspiracy, and felony-firearm convictions identically

to the sentences entered on January 24, 2007. The court imposed a sentence of 17 to 35 years on

the conviction for assault with intent to rob while arm and 7 to 20 years on the conviction for home

invasion. (*Id.* at 14-15.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which

was filed by counsel on February 14, 2008, raised the same nine issues presented in this application

for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #44.) In a lengthy,

unpublished opinion issued on November 20, 2008, the Michigan Court of Appeals affirmed

Petitioner's convictions and sentences, but remanded to the trial court to vacate the convictions on

the predicate offenses of assault with intent to rob while armed and first-degree home invasion.

(*See* 11/20/08 Mich. Ct. App. Opinion (MCOA Op.), docket #44.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme

Court. Petitioner raised the same nine claims presented to and rejected by the Michigan Court of

Appeals. By order entered on September 11, 2009, the Michigan Supreme Court denied his

application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #27.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court

announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The

presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.      Right of Confrontation – Lewis Preliminary Examination

In his first ground for habeas relief, Petitioner contends that he was denied his rights under the Confrontation Clause of the Sixth Amendment, the Michigan constitution and Rule 804(b)(1) of the Michigan Rules of Evidence by the admission of Eddie Lewis' preliminary examination testimony. Petitioner contends that the judge at the preliminary examination limited

- 52 -

his cross-examination, cutting off questions that he deemed repetitive and reminding defense counsel that he was conducting a preliminary examination, not a trial, and that he should stick to questions that had relevance.  (*See* Prelim. Exam. Tr., docket #61-1, Page ID##547, 551-52, 557, 561, 564-66, 578, 586.)  The court instructed defense counsel that it would not allow for discovery through cross-examination.  (*Id.* at 587-88.)  In his motion for new trial, Petitioner provided an affidavit by trial counsel, averring that, during the recess taken between 2:23 and 2:25 p.m., the judge informed defense counsel that he would like to leave early to go fishing.  (*See* Ex. 2 to Br. in Supp. of Pet., docket #2-3, Page ID##89-91.)  Notwithstanding the limitations, however, Petitioner acknowledged at the hearing on the motion for new trial that cross-examination lasted a total of four hours, less the lunch break, which ran approximately one and one-half hours.  (*See* Hr'g on Mot. for New Trial at 18, docket #41.)  Moreover, defense counsel stated on the record that he believed he could streamline his questions and focus on the important issues over the lunch break.  (Prelim. Exam. Tr., Page ID#565.)  In addition, he closed his cross-examination by saying that he had no further questions.  (*Id.* at 593.)

To the extent that Petitioner invokes the Michigan constitution and the Michigan Rules of Evidence, his claim is not cognizable on habeas review.  The extraordinary remedy of habeas corpus lies only for a violation of the U.S. Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws,

or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). "[C]ourts have defined the category of infractions that violate fundamental fairness very narrowly." *Bugh*, 329 F.3d at 512 (internal quotations and citations omitted). Petitioner does not even attempt to show that any violation of the state hearsay rules constituted a violation of due process. Instead, he argues that the constitutional claim rests on the Confrontation Clause.[5]

It is well established that testimonial out-of-court statements by witnesses are barred under the Confrontation Clause unless witnesses are unavailable and defendants had a prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by court. *Crawford v. Washington*, 541 U.S. 36 (2004) (abrogating the standard of *Ohio v. Roberts*, 448 U.S. 56 (1980)); *see also Davis v. Washington*, 547 U.S. 813, 821 (2004). "The Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent, the defense might wish.'" *United States v.*

---

[5]Moreover, it is not at all clear that an independent due process claim is available here, as the question of admissibility is explicitly covered by another constitutional provision, the Confrontation Clause. "Where a particular [a]mendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that [a]mendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 266 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (holding that the Fourth Amendment, not substantive due process, provides the standard for analyzing claims involving unreasonable search or seizure of free citizens, and the Eighth Amendment provides the standard for such searches of prisoners); *see also Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (holding that the First Amendment, not substantive due process, provides the analytical framework for claims of retaliation based on a prisoner's speech).

*Owens*, 484 U.S. 554, 559 (1988) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987); *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

Lewis' testimony at the preliminary examination unquestionably was testimonial. *See Davis*, 547 U.S. at 822 (defining "testimonial" statements); *Crawford*, 541 U.S. at 68 (noting that testimony given at a preliminary examination is testimonial). In addition, Petitioner does not dispute that Lewis was unavailable to testify at trial. Petitioner also does not contest the fact that he had approximately two and one-half hours in which to cross-examine Lewis at the preliminary examination. He contends, however, that his cross-examination was inadequate because it was cut short by the judge, and he did not have sufficient time to explore all of the areas of Lewis' second recorded statement. For this argument, he relies, in part, on the trial court's refusal to hold an evidentiary hearing on the content of the in-chambers discussion in which the trial judge advised defense counsel that he wished to go fishing and would like to finish the hearing promptly.

Relying on the applicable Supreme Court precedent, the Michigan Court of Appeals analyzed the issue as follows:

> The trial court did not deny defendant his Sixth Amendment right of confrontation when it admitted the preliminary examination testimony of Eddie Lewis.[1] If there is an adequate opportunity to cross-examine a witness at the preliminary examination, the requirements of the Confrontation Clause are satisfied, even if the witness is later unavailable at trial. *Crawford v Washington*, 541 US 36, 57; 124 S Ct 1354; 158 L Ed 2d 177 (2004). The Confrontation Clause does not confer on a defendant "an unlimited right to cross-examine on any subject." *People v Canter*, 197 Mich App 550, 564; 496 NW2d 336 (1992).

> Defendant claims that at an in-chambers discussion during the preliminary examination, the district court judge expressed a desire to end the proceedings and go fishing, and as a result, his counsel felt pressured to end his cross-examination of co-conspirator Eddie Lewis. Yet nothing in the record indicates that the judge told defendant to stop questioning Lewis. In fact, defendant's trial counsel admitted that he voluntarily ceased questioning Lewis, and defendant acknowledged that his trial counsel voluntarily ended the cross-examination by indicating that he had no more

- 55 -

questions.[2]  Further, defense counsel did not address on the record the in-chambers conversation with the district court judge.  Defendant fails to acknowledge or identify any on-the-record statements by the judge or defense counsel at the preliminary examination that indicate that defense counsel was forced to stop his cross-examination of Lewis.  Further defense counsel had the opportunity to question Lewis regarding both his interaction with defendant, the circumstances surrounding the Sibson robbery, and other issues central to the establishment of the charged offenses; the judge primarily limited defense counsel's cross-examination of peripheral matters or matters about which defendant claimed to lack knowledge, concluding that defense counsel was using the preliminary examination as an opportunity to essentially conduct discovery and raise doubts regarding Lewis's credibility in order to prepare a transcript for trial.[3]  The Confrontation Clause only guarantees defendant an opportunity for effective cross-examination, "'not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  *People v Chavies*, 234 Mich App 274, 283; 593 NW2d 655 (1999), overruled in part on other grounds *People v Williams*, 475 Mich 245 (2006), quoting *United States v Owens*, 484 US 554, 559; 108 S Ct 838; 98 L Ed 2d 951 (1988).  Because defense counsel had an adequate opportunity to cross-examine Lewis, defendant's right of confrontation was not violated when the trial court later admitted Lewis's preliminary examination testimony.

Although defendant also claims that Lewis's preliminary examination testimony was inadmissible pursuant to MRE 804(b)(1), he merely restates his earlier argument that the admission of this testimony violated the Confrontation Clause. Because defendant fails to specifically argue why Lewis's testimony was not admissible pursuant to MRE 804(b)(1), we will not address this issue.  See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

[1] The parties do not dispute that defendant failed to raise at trial the constitutional questions set forth in this issue. Therefore, these issues are reviewed for plain error affecting defendant's substantial rights.  *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

[2] Specifically, our review of the preliminary examination reveals that defendant's trial counsel ended his cross-examination voluntarily by stating that he had no more questions, and on two occasions after the prosecutor conducted redirect examinations, he noted that he had no further questions.

[3] For example, the trial court told defense counsel to move on with his examination after defense counsel spent a significant amount of time questioning Lewis regarding his first interview with police, although Lewis repeatedly admitted that he was inebriated at the time and could not remember the interview. The judge also limited defense counsel's questioning of Lewis regarding subjects such as Lewis's financial difficulties and the specific path that Lewis and Durst took when driving to Sibson's home to rob him.

(MCOA Op. at 4-5.)

- 56 -

The Sixth Circuit has observed on multiple occasions that there exists some question "'whether a preliminary hearing necessarily offers an adequate prior opportunity for cross-examination for Confrontation Clause purposes.'" *Williams v. Bauman*, 759 F.3d 630, 636 (6th Cir. 2014) (quoting *Al-Timimi v. Jackson*, 379 F. App'x 435, 437 (6th Cir. 2010)); *see also Vasquez v. Jones*, 496 F.3d 564, 577 (6th Cir. 2007) (doubting whether "the opportunity to question a witness at a preliminary examination hearing satisfies the pre-Crawford understanding of the Confrontation Clause's guarantee of an opportunity for effective cross-examination") (internal quotation marks omitted)).  Yet the Supreme Court has concluded that at least some preliminary-examination transcripts are admissible at trial.  *See, e.g., Roberts*, 448 U.S. at 70 (holding that the opportunity to cross-examine at the preliminary hearing was sufficient, even if the opportunity was not exercised); *California v. Green*, 399 U.S. 149, 165 (1970) (finding that the admission of preliminary examination testimony did not violate the Confrontation Clause because the circumstances of the preliminary examination at issue were sufficiently similar to those at trial).

As the trial court indicated in its opinion and order denying Petitioner's motion for new trial, the instant case involved unusual circumstances, in which the defense had available at the preliminary hearing the recorded and transcribed statements of both Eddie and Anjanette Lewis. Counsel did not merely have the opportunity for cross-examination, he actually engaged in vigorous and extensive cross-examination, using Eddie Lewis' prior statements and highlighting the inconsistencies with his preliminary-examination testimony.  Defense counsel cross-examined Eddie Lewis extensively and repetitiously over approximately two and one-half hours.  Petitioner does not specifically identify any significant area for cross-examination that was not explored, though he suggests that he should have had more time to cross-examine on the second statement.  That statement, however, was similar to the testimony Lewis provided at the preliminary examination,

providing few opportunities for effective impeachment.  (*See* 3/15/06 Tr. of Interview of Eddie Lewis at 1-82, docket #47.)  Indeed, spending additional time on the second statement might well have reinforced the impact of Eddie Lewis' testimony.  Considering all these facts, it is difficult to imagine any case in which the transcript of a preliminary examination would be admissible, if not in this one.

Moreover, even if the Confrontation Clause may ultimately be held to require "something more than the opportunity to cross-examine a declarant at the defendant's own preliminary hearing . . . , the state court's resolution of the issue against [Petitioner] is not susceptible to this court's second-guessing."  *Williams*, 759 F.3d at 636 (emphasis added) (citing *Woodall*, 134 S. Ct. at 1703) (emphasizing that the question under the AEDPA is whether the issue is "beyond any possibility for fairminded disagreement") (citations omitted)); *see also Al-Timimi*, 379 F. App'x at 440 (holding that the state court's determination of admissibility of preliminary examination testimony survived AEDPA deference because the Supreme Court has "disclaimed any intent 'to map out a theory of the Confrontation Clause'") (citing *Green*, 399 U.S. at 162).  Because the Supreme Court has not affirmatively determined precisely how much cross-examination is required to allow admission of preliminary-examination testimony, the state court's determination that Petitioner had an adequate opportunity for cross-examination is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

II.   Right of Confrontation – Anjanette Lewis Testimony

In his second ground for habeas relief, Petitioner contends that his right to confront witnesses was violated when Anjanette Lewis was permitted to testify to the statements made to her by Eddie Lewis shortly after the shooting.[6]

As I previously discussed,  testimonial out-of-court statements by witnesses are barred under the Confrontation Clause unless witnesses are unavailable and defendants had a prior opportunity to cross-examine witnesses. *Crawford*, 541 U.S. 36.  The *Crawford* Court concluded that custodial police interrogations were considered testimonial, triggering protection under the Confrontation Clause.  In contrast, a statement taken by police officers during the course of an interrogation is nontestimonial when made under circumstances objectively indicating that the primary purpose of the interrogation is to enable police to meet an ongoing emergency.  *See Davis v. Washington*, 547 U.S. 813 (2006).  In addition, a dying declaration made to police by a shooting victim is non-testimonial under *Crawford*. *See Michigan v. Bryant*, 131 S. Ct. 1143 (2011).  Further, the Supreme Court has held that the statements made by a three-year-old to his preschool teacher was not testimonial, despite the mandatory reporting requirement applicable to teachers under state law. *See Ohio v. Clark*, 135 S. Ct. 2173 (2015); *see also White v. Illinois*, 502 U.S. 346 (1992) (finding that statements by a four-year-old victim to her babysitter and mother were not testimonial).

In the instant case, Lewis' statement to his wife was not testimonial.  Lewis told his wife what had happened immediately after he got home, while he was highly upset, and he solicited her assistance in burying the items related to the shooting.  "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their

---

[6]Petitioner also invokes the Michigan constitution and the Michigan Rules of Evidence.  As I previously discussed, habeas review is not available for violations of state law. *Estelle*, 502 U.S. at 67-68.  The sole issue before this Court, therefore, is whether the admission violated the Confrontation Clause.

development of hearsay law – as does [the petitioner], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at 68. Because the statement was nontestimonial, its admission was covered solely by state evidentiary law, which is not reviewable in this proceeding. *Id.*

III.    Fifth Amendment Right to Counsel

Two of Petitioner's statements, both of which were recorded, were used as evidence at trial. Petitioner was first interviewed on February 28, 2006. Petitioner was given his *Miranda* warnings, and he acknowledged understanding them. Petitioner then answered some questions, but he substantially denied any involvement in the shooting or drug trafficking with the victim. (*See* Tr. of 2/28/06 Weissert Interview (Weissert I), Ex. A to Appellee's Resp. to Appl. for Lv. to Appeal at 4-24, docket #45.) After a substantial period of time, Petitioner stated, "I think maybe that I should probably have an attorney here if you're going to be questioning me unless you're gonna tell me what I am being charged with." (*Id.* at 24.) The officer indicated that he was just asking questions about a drug case, asking Petitioner if he was worried about a drug case, and indicating that he was not interested in whether Petitioner was involved in drugs when he was investigating a homicide. After asking if he was being arrested, Petitioner expressly invoked his right to counsel, saying that he would answer more questions after he had a lawyer. (*Id.* at 25-26.)

On March 2, 2006, police conducted a second interview of Petitioner, after Petitioner sent word that he wished to talk to the officers. (*See* Tr. of 3/2/06 Weissert Interview (Weissert II), Ex. B to Appellee's Resp, to Appl. for Lv. to Appeal, docket #45.) Petitioner told the interviewers that he had not been completely honest at his initial interview. (*Id.* at 8.) Petitioner stated that he had not killed Frank Sibson and that he was not at Sibson's house on the night he was killed. (*Id.*

at 5.)  Petitioner indicated that he wanted to do everything he could to make it right, that he would

have an attorney the following day when he was arraigned, but that he wanted to answer some

questions that night and wanted to be frank with the officers.  He said that he did not want to waste

the officers' time, but he thought he should have an attorney when he told everything.  (*Id.* at 7.)

Q.    Now, or when.

A.    I would – I'd like to have an attorney present.  I mean, I'll answer some of
       your questions now.  You've got to pick me to see if I'm bullshittin' you sir,
       'cause I'm not.  I'm telling you the truth and I'm being frank with you.

Q.    Well, see, we have to be careful.  This is a little bit dangerous ground for us.
       If you want an attorney present, um, to be sure that your rights aren't
       touched, harmed and that you're doing the right thing, then we can't do
       anything here tonight.  If you're willing to trust us and – well, you called this
       meeting so –

A.    OK.

Q.    – you're apparently looking to trust somebody.

A.    I am.  OK.

Q.    If you're willing to at least answer our questions now, and whether or not
       they incriminate you is part of the deal –

A.    OK.

Q.    – you have to tell us that.

A.    I want you to know though, and I'll tell you this on both my son's and my
       wife's life, and I am a family man and I love  my family dearly and this is a
       lot of me coming forward.  OK?  I was not there that night.

(*Id.* at 7-8.)  Petitioner acknowledged that he had been present for a conversation in which Lewis

and Durst planned the robbery, though he insisted that Durst was only going to drive and the men

were only going to break into the barn to steal money and drugs.  (*Id.* at  )  Petitioner swore that he

was home the night of the shooting.  The officer responded:

Q.      All right.  But I want you to know that we – we can't go halfway and you step up to the line and realize you're on dangerous ground then invoke your Sixth Amendment and back away; step back up to the line, invoke your Sixth Amendment.  Or you've got to tell us you don't want to talk to us without an attorney.  Because what happens then is every question is – is decided whether or not you voluntarily wanted to answer it.

A.      I want you to believe, sir, that when I have an attorney sitting here next to me I'm going to clean slate everything to you.

Q.      The thing is, your attorney might disagree with what you want to do.  So, you might not get the opportunity.  He might say no, you're not talking to anybody.

A.      Well, I didn't murder anybody, OK?

Q.      OK.

A.      And I'm not a big mastermind if this is where we're going and –

(*Id.* at 9.)  Petitioner continued to answer many questions, though Petitioner declined to answer certain questions.  (*Id.* at 10-14.)

Q.      All right.  We're going to talk about Eddie and Dan.  Let's just say for the sake of argument that we're going to believe you right now that you weren't there.

A.      For the sake of argument, yeah.

Q.      This thing was planned out, and somewhere along the line you knew it was planned out.  And maybe you even helped describe the layout of the house or something like that.  Anything like that?

A.      That's pushing it.

Q.      Well, did you talk to them about Frank's house?

A.      Uh, let's just say that, uh, I don't believe I ever had a discussion with Dan and I'm sure Ed knew the layout of his house.

(*Id.* at 14.)  Petitioner reported that the plan was just to rob the barn and that he thought "somebody got greedy."  (*Id.* at 15.)  Petitioner acknowledged understanding that a person could be an accessory

- 62 -

to a crime without actually performing the crime, though he did not know exactly what was

sufficient to be an accessory.  He stated that he was talking to the officers to help himself and to help

clear things up.  He added,

> A.    I just – you know I've seen enough TV shows and enough people to know
> that I should have an attorney with me when I'm talking.  Now I know that,
> you know, Terry Nolan was my attorney when I needed one.  He's obviously
> not, uh, doing that kind of work anymore. . . . The last time I needed an
> attorney they had Dave Williams fill in because Terry was in rehab.  But I'm
> sure there's somebody from that Nolan & Nolan office who could come, uh,
> over and, uh, represent me.

> Q.    Well, you know, if that's what you want to do, then we'll do that.  We
> honored your demand for an attorney last night.

> A.    Well I haven't got to see one yet, but I would like to get it off my chest but
> I would like to have an attorney there.  Look, I'm not fuckin' you guys
> around.  Look at me, I'm trying to do the right thing.  I'm trying to be
> straight with you.  I know you want me to tell you everything right now.  But
> –

> Q.    No, I actually gave you an out right now.  I said tell us all about them, Eddie
> and Danny.  You can omit your part now until you have an attorney present.
> that's the option I gave you.  I want to know what they discussed in the car
> and you seem to have a hard time answering that.  And if it's because you
> discussed it with them, tell me that.

> . . .

> A.    Is it going to be possible to do this with an attorney tomorrow?

> Q.    Sure.  The thing is, if you call an attorney you might not get your opportunity
> even to talk to us, and that's fine.  That's what the constitution says.

> A.    I hope that's not the case.

> Q.    Well, I'm not going to sit here an[d] argue with you about an attorney.
> You're either going to – you're either going to voluntarily give us a
> statement –

> A.    OK. OK.  You're quiet.  What are you thinking?

- 63 -

> DET. LOHMAN:  I'm just going along with him.  Basically the same thing.  You keep bringing up the attorney part, but yet you keep saying that you want – you want to talk, you want to be honest, you want to get it off your chest.  And an attorney may not want you to do that, you know.
>
> MR. WEISSERT:  Well, how about I do this:  I give you something now and then tomorrow we finish.

(*Id.* at 18-21.)  Petitioner then talked with the investigators about the roles of Lewis and Durst for a substantial period of time without stating his desire for an attorney.  (*Id.* at 22-44.)  At that point Detective Sergeant Miles stated,

> Q.   Now I told you we're not going to talk about things that might incriminate you or nothing, and we're not going to do that.  But are you going to be want – interested in talking to us again with an attorney present when I can ask the hard questions about your role.
>
> A.   Yes.  Yes, sir.
>
> Q.   Are you going to seek an attorney, because you're going to have a very difficult time getting a court-appointed one with your financial status. . . . But, you know, I'm not going to jeopardize this case by getting a wishy-washy thought on the Sixth Amendment and all that.  If you want an attorney –
>
> A.   I do, sir.
>
> Q.   – and further this – your assistance to this – I think we should stop now.  Right?
>
> A.   I just want to be straight up with you guys and I want you to believe I am and I'm telling you – I know you're looking at me like I'm full of shit on him driving, but that was the story I got.

(*Id.* at 44-45.)  Petitioner continued to reiterate his story that the plan was to take money from Frank Sibson, that Durst was to drive and that a shooting was never planned.  (*Id.* at 45-48.)  Finally, Petitioner stated that he thought he had been helpful, and the detectives agreed that he had been helpful to a certain extent and that he had been evasive, too.  Detective Miles told Petitioner that he

believed that Petitioner needed an attorney and that, as a detective, he often welcomed an attorney rather than risking technical problems on a case.  (*Id.* at 49.)  Petitioner, however, continued to initiate conversation with the detectives.  Several minutes later, Detective Miles again stated, "I only call it as I see it and there's more but you certainly want the protection of an attorney before you reveal any more."  (*Id.* at 52.)  Petitioner then began asking how he could contact an attorney, and the officers indicated that he would be allowed to make a phone call.  (*Id.*)

Petitioner contends that he was denied his rights under the Fifth Amendment when his questioning continued after he requested an attorney.  The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, in order to protect an individual's Fifth Amendment privilege against self incrimination, when a person is in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel.  *Id.* at 478-79; *see also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994).  The Supreme Court repeatedly has reaffirmed that, when a suspect who is in custody has asked for a lawyer, the suspect must not be subjected to further interrogation until a lawyer has been provided, unless the suspect initiates a discussion.  *See Edwards v. Arizona*, 451 U.S. 477. 484 (1981); *Arizona v. Roberson*, 486 U.S. 675, 680 (1988) (citing *Miranda*, 384 U.S. at 474).  The rule is designed to prevent police "'badgering' or 'overreaching' – explicit or subtle, deliberate or unintentional – [that] might otherwise wear down the accused and persuade [the suspect] to incriminate himself."  *Smith v. Illinois*, 469 U.S. 91, 98 (1984).

Determining whether a custodial statement is improper after the a suspect has invoked his right to counsel requires a two-part inquiry:

> First, courts must determine whether the accused actually invoked his right to counsel. . . . Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.

*Smith*, 469 U.S. at 95.  *See also Van Hook v. Anderson*, 488 F.3d 411, 416 (6th Cir. 2007) (en banc). Under the first inquiry, the court must determine whether the suspect unambiguously requested counsel. *Van Hook*, 488 F.3d at 414 (citing *Davis v. United States*, 512 U.S. 452, 458 (1994)).  "If the accused makes an 'ambiguous or equivocal' statement, or no statement, the police are not required to end the interrogation . . . ."  *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (citing *Davis*, 512 U.S. at 459, 461-62).  The requirement that the invocation of the right be unambiguous "'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity."  *Id.* at 382 (quoting *Davis*, 512 U.S. at 458-59).

The Michigan Court of Appeals found that Petitioner had not unambiguously invoked his right to an attorney:

> The trial court did not violate defendant's Fifth Amendment right to counsel when it admitted into evidence recordings of defendant's statements to the police taken while he was in custody.  Although statements by the accused "made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his Fifth Amendment rights," *People v Harris*, 261 Mich App 44, 55; 680 NW2d 17 (2004), the defendant's invocation of his right to counsel must be unequivocal.  *People v Tierney*, 266 Mich App 687, 711; 703 NW2d 204 (2005).  To determine if a defendant's statement was freely and voluntarily made, a court must consider the totality of the circumstances.[6]  *People v Shipley*, 256 Mich App 367, 374; 662 NW2d 856 (2003).

> The record evidence demonstrates that defendant understood his *Miranda*[7] rights and waived them in a knowing and intelligent manner.  Defendant's age and experiences indicate that he understood his right to an attorney and voluntarily talked

to the police twice while in custody. Defendant was in his early 40s, and the police thought that he was more intelligent than his coconspirators. Defendant had been arrested before for assault and battery and had been questioned by police in that incident. Defendant was read his *Miranda* rights before the February 28 interview and was reminded of his *Miranda* rights before the March 2 interview. There is no indication that defendant was intoxicated or drugged during either interview, nor has he indicated that he received improper treatment while in custody.

No error arose from the admission of a recording of the February 28 interview. Defendant was read his Miranda rights, but he did not immediately request an attorney. However, the officers stopped the interview when defendant requested an attorney. His statements to the officers were voluntary, and his right to counsel was not violated.

Similarly, the trial court did not err when it admitted a recording of defendant's March 2 interview with police. Defendant requested the interview, was reminded of his *Miranda* rights at the beginning of the interview, and acknowledged that he wanted to talk to the police regarding information that he had on Sibson's murder. The officers had ended the February 28 interview with defendant once he requested an attorney, so defendant was aware that he could again request an attorney and stop the interview.

During the interview, defendant indicated that he wanted to have an attorney present when he revealed all the information he had regarding Sibson's murder, but he also wanted to give the officers some information that evening. Defendant then agreed to the officers' suggestion that he discuss Lewis and Durst's roles in the Sibson murder that evening, and then wait to discuss his role in the robbery and murder once he had an attorney present. Although defendant provided some information regarding Lewis and Durst's roles in the Sibson murder, he did not acknowledge any wrongdoing or provide details regarding his own involvement, and the officers honored defendant's request not to question him directly regarding his involvement in the murder that evening. Finally, defendant did not make an unequivocal statement that he wanted an attorney to be present; instead, the officers made the first unequivocal suggestion, near the end of the interview, that defendant should get an attorney. Considering that defendant never made an unequivocal, unambiguous invocation of his right to counsel during the interview, the officers did not violate defendant's right to counsel when they continued to question him despite his inquiries regarding an attorney. See *Tierney*, *supra* at 711.

> [6] A court may consider the following factors when determining if a statement was freely and voluntarily made:
>
> > [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the

accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*People v Sexton (After Remand)*, 461 Mich 746, 753; 609 NW2d 822 (2000), quoting *People v Sexton*, 236 Mich App 525, 543–544; 601 NW2d 399 (1999) (MURPHY, J., dissenting).]

[7] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

(MCOA Op. at 6-7.)

Although the court of appeals cited state, rather than federal, cases, it applied the applicable standard of review. Petitioner does not dispute that the detectives immediately ceased questioning at the February 28, 2006, interview after Petitioner stated that he wanted an attorney. Moreover, as is apparent from the quoted sections of Petitioner's testimony, Petitioner never unambiguously requested counsel in the March 2, 2006, interview. Instead, Petitioner was cagey; he repeatedly indicated that he wanted to have it both ways. He indicated on multiple occasions that he wanted to talk with the detectives about Lewis and Durst, in order to appear cooperative. Yet he also repeatedly stated that he would want an attorney before answering the detectives' questions about his personal role in the incident. In fact, even when Detective Miles first advised Petitioner that he should have an attorney, Petitioner continued to talk about his desire to have the police believe him, and he reiterated his prior statements about the roles of Lewis and Durst. On these facts, as the state court recognized, Petitioner's request for an attorney was never unambiguous; it was always conditioned on the type of questions the detectives asked. As a consequence, the state court's determination of Petitioner's third ground for habeas relief constituted a reasonable application of clearly established Supreme Court precedent.

## IV.   Sufficiency of the Evidence

- 68 -

In his fourth claim on habeas review, Petitioner argues that insufficient evidence existed to sustain his guilty verdicts on an aiding and abetting theory. Petitioner argues that the evidence supported Petitioner's theory that the only subject of the agreement was the robbery of the pole barn and that he could not be held responsible in the robbery of the Sibson home, which was not a natural and probable consequence of the robbery plan. Petitioner also argued that the prosecution failed to show by admissible evidence (that is, not including the improperly admitted testimony of Ed Lewis) that Petitioner knew of any plan to use a firearm, and therefore the evidence was insufficient to support either the felony-firearm charges or the armed-robbery charge.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both

the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'"  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).

The Michigan Court of Appeals addressed the argument at length:

Defendant claims that the evidence merely established that he had assisted and encouraged Lewis and Durst to break into Sibson's pole barn, and that Lewis unilaterally decided to break into Sibson's house instead.  Defendant argues that, because the home invasion and assault offenses underlying his felony-murder conviction were not "natural and probable consequences" of the plot to break into Sibson's pole barn, he was not culpable for Lewis's actions.

However, both circumstantial and direct evidence presented at trial indicates that defendant intended for Lewis and Durst to break into Sibson's home, not his pole barn.[10]  Although Sibson kept his drugs in his pole barn, he kept his drug money in his house.  Sibson also called in debts that his buyers owed him just before going to Chicago for more drugs.  Not only were defendant and Sibson friends, but Sibson was also defendant's drug supplier, so defendant was familiar with Sibson's drug trade.  Further, defendant told Lewis that Sibson would have a lot of money in his house on the evening of January 31 because he had been collecting all his money from drug deals and planned to go to Chicago to get more marijuana the following day.  According to Durst, when defendant, Lewis, and Durst met on January 31, defendant did not mention stealing drugs from Sibson; instead, he mentioned that Sibson "was making too much money" and that if Durst helped Lewis, he "would get the money [he] needed."  Lewis admitted that defendant told him to break into Sibson's home to take his drug money and gave Lewis a gun for his protection because he would be carrying a lot of money.[11]

This evidence, taken together, is sufficient to permit a reasonable juror to conclude that defendant helped Lewis and Durst break into the Sibson home, not the pole barn.  If defendant and Lewis merely planned to break into Sibson's unoccupied pole barn, they would not need masks to obscure their identities or a weapon with which to threaten a victim.  Further, not only was defendant familiar with Sibson's drug trade, but he told Lewis that he knew that Sibson would have a lot of cash in his house on the evening of January 31, and his comments to both Durst and Lewis indicate that he intended for those men to break into Sibson's house to steal it.  Accordingly, defendant's claim that the prosecution presented insufficient evidence

to establish that defendant did not intend for Lewis and Durst to break into the pole barn lacks merit.

Defendant also argues that the prosecution presented insufficient evidence to convict him of felony-firearm under an aiding and abetting theory, because "there was no admissible evidence that Defendant knew about or planned any sort of crime utilizing a gun." Defendant admits that Lewis testified that defendant gave him a gun, but he asks us to disregard this testimony on the ground that Lewis's statements were inadmissible for the reasons discussed earlier. Because we have concluded that Lewis's statements are admissible, we hold that defendant's claim that the prosecution presented insufficient evidence to establish defendant's felony-firearm convictions lacks merit.

We also conclude that the evidence presented at trial was sufficient to support defendant's conviction for conspiracy to commit armed robbery. To establish a charge of conspiracy to commit armed robbery, the prosecution must establish that the defendant intended to combine with others to accomplish an illegal objective, namely, armed robbery. MCL 750.157a; *People v Mass*, 464 Mich 615, 629; 628 NW2d 540 (2001). In particular, the prosecution must establish that the parties "specifically intended to further, promote, advance, or pursue" this unlawful objective. *People v Justice (After Remand)*, 454 Mich 334, 347; 562 NW2d 652 (1997).

Lewis, Durst, and defendant met on the evening of Sibson's murder and planned to rob him. As Lewis later admitted to Anjanette and at the preliminary examination, defendant had the idea to rob Sibson, learned from Sibson when he would go to Chicago to purchase more drugs, and met with Durst and Lewis to plan the robbery for the night of January 31. Defendant also gave Lewis a gun to use for the robbery. This evidence indicates that defendant, Lewis, and Durst united to accomplish an illegal objective, namely armed robbery. Further, the evidence indicates that an armed robbery occurred.[12] Defendant, Lewis, and Durst agreed to commit a larceny by taking money from Sibson. By providing Lewis with a gun, defendant conspired with Lewis to commit this larceny by using a dangerous weapon, presumably to scare Sibson into complying.

[10] "Circumstantial evidence and reasonable inferences drawn from it may be sufficient to establish the elements of a crime." *People v Fennell*, 260 Mich App 261, 270; 677 NW2d 66 (2004).

[11] Lewis also had a BB rifle and identity-obscuring masks for himself and Durst when they arrived at the Sibson home.

[12] An armed robbery occurs if the following elements are met:

(1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence

> against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007).]

(MCOA Op. at 8-10.)

The state court's determination of the issue is patently reasonable and little supplemental analysis is required. As the court of appeals noted, Petitioner's claim of insufficiency rests on his preferred interpretation of the evidence, not on the evidence viewed in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319. Moreover, as the state court also observed, and as I have previously discussed, the admissions of Lewis' statements were constitutionally permissible. Lewis' testimony, which was corroborated in substantial part by many witnesses, provided sufficient evidence for a reasonable jury to conclude that Petitioner conspired and, as an aider and abettor, attempted to rob Frank Sibson by means of entering his home, not the pole barn. Moreover, Lewis' testimony demonstrated that Petitioner's intent was to participate in an armed robbery, since Petitioner gave Lewis the gun to use in the robbery. In addition, the testimony of other witnesses proved that the unique handgun Lewis used and subsequently buried belonged to Petitioner. The evidence fully supported the elements of the offenses of armed robbery and conspiracy, as outlined in the state-court opinion.

The same facts fully supported the jury's finding that Petitioner was guilty of first-degree home invasion. The elements of home invasion are (1) breaking and entering (2) a dwelling (3) with intent to commit a felony, larceny or assault in the dwelling. The offense is punishable as a first-degree home invasion if, at the time the defendant was present in the dwelling, he was either armed with a dangerous weapon or another person was lawfully present in the dwelling. MICH.

COMP. LAWS § 750.110a(2); *see Johnson v. Warren*, 344 F. Supp. 2d 1081, 1093 (E.D.Mich.2004) (Michigan first-degree home invasion statute includes all the elements of burglary of a dwelling, but also requires that the defendant be armed with a dangerous weapon or that the dwelling be occupied). Under Michigan law, the element of breaking is satisfied by any amount of force used to open a door or window to enter a building, no matter how slight. *See People v. Toole*, 227 Mich. App. 656, 576 N.W.2d 441, 443 (1998). Consequently, even if a defendant pushes aside an already open door, the element of breaking is satisfied. *See People v. Hill*, 36 Mich. App. 679, 193 N.W.2d 909, 911 n.1 (1971).

As discussed, Eddie Lewis was armed with a weapon provided him by Petitioner, and a weapon that would not have been necessary if the object of the larceny was the pole barn. Moreover, Eddie Lewis testified that Petitioner showed him the house and told him where to enter. Thereafter, according to both Lewis and Durst and in accordance with the plan, the two entered the home in the early morning hours with the intent to rob Frank Sibson, knowing that Sibson was in bed and likely asleep. Although the door was partially open already, both Lewis and Durst testified that Lewis pushed it open farther to enter the home. As a result, the jury had sufficient evidence to conclude that Petitioner aided and abetted a first-degree home invasion.

Finally, Lewis' testimony that Petitioner conspired with Lewis and Durst and gave Lewis the German handgun to use in the home invasion and the attempt to rob while armed supported Petitioner's convictions for possession of a firearm during the commission of all three felonies, as an aider and abettor.

In sum, the state court's determinations on Petitioner's challenges to the sufficiency of the evidence were neither contrary to nor an unreasonable application of Supreme Court precedent, nor were they based on an unreasonable determination of the facts.

V.      Due Process – Jury Instruction on Malice

Petitioner contends that the non-standard jury instruction on the element of malice required for second-degree murder was incorrect under state law, relying on the wrong set of Michigan cases.  He suggests that the error deprived him of his right to a jury trial under the Sixth Amendment.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law.  *Id.*

Petitioner fails to demonstrate that the jury instruction was erroneous, much less that the error was so serious as to cause fundamental unfairness in violation of due process.  The Michigan Court of Appeals held that, under Michigan law, the instruction on malice was correct. It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 68.  The decision of the state courts on a state-law issue is binding on a federal court.  *See Wainwright v. Goode*, 464 U.S.

- 74 -

78, 84 (1983); *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (reiterating "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus'") (quoting *Bradshaw*, 546 U.S. at 76). Because the instruction was correct under state law, Petitioner cannot demonstrate that the use of the instruction violated his rights under the federal constitution.

VI.     Ineffective Assistance of Trial Counsel

Petitioner next argues that his trial attorney was ineffective in failing to object on confrontation grounds to the admission of Eddie Lewis' preliminary examination testimony and the admission of Anjanette Lewis' testimony about Eddie Lewis' statement to her.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that

- 75 -

counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

Although the state court did not expressly address the claim that counsel was ineffective, it held that Petitioner's confrontation claims were meritless.[7] As I previously held, that determination constituted a reasonable application of clearly established Supreme Court precedent. Because the evidence was properly admitted under the Confrontation Clause, any motion or objection citing the confrontation issue would have been meritless. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir.

---

[7]As earlier quoted in this report and recommendation, the Michigan Court of Appeals noted in footnotes one and four of its opinion, the trial attorney objected to the admission of the evidence under the Michigan Rules of Evidence, so the court of appeals declared that it would review the confrontation question only for plain error. (*See* MCOA Op. at 4-5 n.1, n.4.) Nevertheless, the court of appeals engaged in a thorough analysis of the confrontation issue, and its ruling was not limited to a determination that the admission of the evidence was not plainly erroneous.

2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).  Accordingly, Petitioner is not entitled to relief on his sixth habeas ground.

VII.   Failure to Hold Evidentiary Hearing

Petitioner argues that the trial court abused its discretion by failing to hold an evidentiary hearing about the content of a three-minute, in-chambers discussion that allegedly prompted defense counsel to cut short his cross-examination, though he did not terminate it immediately.  The court of appeals addressed the question as follows:

Defendant argues that the trial court abused its discretion when it failed to order an evidentiary hearing regarding an alleged conversation between the district court judge and the parties' attorneys in chambers during the preliminary examination regarding the district court judge's desire to go fishing that afternoon. Defendant claims that the district court judge's desire to go fishing that afternoon led to his irritability during the preliminary examination and his interference with defense counsel's cross-examination of Lewis, preventing his counsel from conducting a full-scale cross-examination of Lewis.[14]

Although defendant acknowledges that the district court judge made statements indicating that his counsel should not conduct a full-scale cross-examination of Lewis during the preliminary examination, defendant fails to identify any on-the-record testimony or statement in support of his claim that the district court stopped the questioning and prevented his counsel from completing his cross-examination.[15]  In fact, defendant acknowledges that his trial counsel ended the cross-examination of Lewis by indicating that he had no more questions and declined two additional opportunities to question Lewis regarding additional points raised after his cross-examination was finished.  Defendant does not present any binding authority to establish that the district court judge's statements at the preliminary examination encouraging defense counsel to cross-examine Lewis in a timely and efficient manner or his alleged statements in chambers indicating his desire to go fishing could be used to establish that the district court judge was unwilling to provide a full opportunity for defendant's attorney to fully cross-examine Lewis, nor does he provide authority to support his apparent contention that failure to provide a full opportunity for cross-examination would automatically preclude the admission of Lewis's preliminary examination testimony at trial.  Because defendant fails to establish his argument that the trial court erred when it failed to order an evidentiary hearing, we will not address the issue further.[16]  *See Mitcham*, supra at 203.

- 77 -

[14] Because the trial court later admitted Lewis's preliminary examination testimony in lieu of his testimony at trial, defendant claims that he was harmed by the district court judge's denial of an opportunity for his counsel to fully cross-examine Lewis during the preliminary examination.

[15] Further, our review of the preliminary examination transcript indicates that such a statement was not made.

[16] The only support that defendant provides from this position comes from our Supreme Court's order in *People v Leonard*, 638 NW2d 415 (2002). In *Leonard*, our Supreme Court ordered the trial judge to provide a sworn statement concerning the "nature, content and particulars of any off-the-record and in-chambers discussions between the court, [the prosecutor], and defense counsel . . . ." However, our Supreme Court requested this sworn statement in order to determine whether to grant leave to appeal in the case. The Supreme Court order does not support defendant's claim that this Court should remand the case for a factual determination regarding the reasons for the district court judge's behavior during the preliminary examination. Further, although Supreme Court peremptory orders are binding precedent when the reasoning can be understood, this order was not the final order in this case and it did not contain either a concise statement of applicable facts or a reason for the Court's decision. See *People v Crall*, 444 Mich 463, 464 n 8; 510 NW2d 182 (1993).

(MCOA Op. at 11-12.)

Petitioner's claim that he was deprived of an evidentiary hearing is intertwined with his claim that the admission of Eddie Lewis' preliminary-examination testimony violated the Confrontation Clause. I have discussed at length the substantial opportunity for cross-examination exercised by Petitioner and have concluded that the state court's determination that the preliminary examination was admissible was not contrary to or an unreasonable application of Supreme Court precedent. Whether or not the judge's limitations on Petitioner's cross-examination were caused by his desire to go fishing – or on defense counsel's repetitive examination style – is irrelevant to whether those limitations rendered his opportunity for cross-examination inadequate under the Confrontation Clause. In fact, the trial judge found just that when it denied the evidentiary hearing:

The key phrase is '"[a]nd as we observed earlier this Term, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross examination that is effective in whatever way, and to whatever extent the defense might wish."

Understood this way, the focus must be what happened *on* the record, not what happened off it. For the reasons described at trial, this cross examination

- 78 -

> satisfied the *Van Arsdall* standard.    Further analysis about what happened in chambers is both irrelevant and unnecessary.  The key is what happened in court, not the *reasons* for that.

(10/25/07 Cir. Ct. Op. & Ord. (quoting *Van Arsdall*, 475 U.S. at 679) (internal quotation omitted) (emphasis in original), docket #2-7, Page ID#4.)  As a consequence, the state court's decision not to hold an evidentiary hearing had no impact on Petitioner's confrontation claim, and Petitioner has identified no other constitutional implication.

VIII.    <u>Sentence Improperly Enhanced by Judicial Factual Findings</u>

Petitioner argues that the trial court judge violated his Sixth Amendment and Fourteenth rights to a trial by jury by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable doubt.  Petitioner bases his argument on the United States Supreme Court holding in *Blakely v. Washington*, 542 U.S. 296 (2004).  *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge.  Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant.  The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt.  *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term.  The maximum sentence is not determined by the trial judge, but

- 79 -

is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range. *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)). The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely*. *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007). Therefore, the state court's determination of Petitioner's claim was not contrary to federal law clearly established by the United States Supreme Court or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

IX.    Other Bad Acts Evidence under MICH. R. EVID. 404(b)

In his final ground for habeas relief, Petitioner contends that the trial court improperly permitted the introduction of evidence that, on the day before the events at issue in the instant case, Petitioner recruited Eddie Lewis and Danwood Durst to steal a golf cart or ATV.  He also complains that the court permitted the introduction of evidence concerning Petitioner's own drug-dealing activities.

At trial and on appeal, Petitioner argued that the evidence was improperly admitted under Michigan law.  As I previously discussed, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Estelle*, 502 U.S. at 67-68.  Moreover, there exists no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state

violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Because there was no constitutional violation in the admission of other bad-acts evidence, the state court decision was "far from" an unreasonable determination of the facts in light of the evidence presented. *Clark v. O'Dea*, 257 F.3d 498, 502 (6th Cir. 2001); *see also Bugh*, 329 F.3d at 512.

### **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated: July 31, 2015                      /s/ Phillip J. Green
                                          Phillip J. Green
                                          United States Magistrate Judge

### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).   Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).